# WOODSON ET AL. v. NORTH CAROLINA

No. 75–5491.   Argued March 31, 1976—Decided July 2, 1976

*Anthony G. Amsterdam* argued the cause for petitioners. With him on the brief were *Jack Greenberg, James M. Nabrit III, Peggy C. Davis, Adam Stein, Charles L. Becton, Edward H. McCormick,* and *W. A. Johnson.*

*Sidney S. Eagles, Jr.,* Special Deputy Attorney General of North Carolina, argued the cause for respondent. With him on the brief were *Rufus L. Edmisten,* Attorney General, *James E. Magner, Jr.,* Assistant Attorney General, *Jean A. Benoy,* Deputy Attorney General, and *Noel L. Allen* and *David S. Crump,* Associate Attorneys General.

*Solicitor General Bork* argued the cause for the United States as *amicus curiae.* With him on the brief was *Deputy Solicitor General Randolph. William E. James,* Assistant Attorney General, argued the cause for the State of California as *amicus curiae.* With him on the brief were *Evelle J. Younger,* Attorney General, and *Jack R. Winkler,* Chief Assistant Attorney General.*

Judgment of the Court, and opinion of MR. JUSTICE STEWART, MR. JUSTICE POWELL, and MR. JUSTICE STEVENS, announced by MR. JUSTICE STEWART.

The question in this case is whether the imposition of a death sentence for the crime of first-degree murder under the law of North Carolina violates the Eighth and Fourteenth Amendments.

I

The petitioners were convicted of first-degree murder as the result of their participation in an armed robbery

---

*Arthur M. Michaelson* filed a brief for Amnesty International as *amicus curiae.*

of a convenience food store, in the course of which the cashier was killed and a customer was seriously wounded. There were four participants in the robbery: the petitioners James Tyrone Woodson and Luby Waxton and two others, Leonard Tucker and Johnnie Lee Carroll. At the petitioners' trial Tucker and Carroll testified for the prosecution after having been permitted to plead guilty to lesser offenses; the petitioners testified in their own defense.

The evidence for the prosecution established that the four men had been discussing a possible robbery for some time. On the fatal day Woodson had been drinking heavily. About 9:30 p. m., Waxton and Tucker came to the trailer where Woodson was staying. When Woodson came out of the trailer, Waxton struck him in the face and threatened to kill him in an effort to make him sober up and come along on the robbery. The three proceeded to Waxton's trailer where they met Carroll. Waxton armed himself with a nickel-plated derringer, and Tucker handed Woodson a rifle. The four then set out by automobile to rob the store. Upon arriving at their destination Tucker and Waxton went into the store while Carroll and Woodson remained in the car as lookouts. Once inside the store, Tucker purchased a package of cigarettes from the woman cashier. Waxton then also asked for a package of cigarettes, but as the cashier approached him he pulled the derringer out of his hip pocket and fatally shot her at point-blank range. Waxton then took the money tray from the cash register and gave it to Tucker, who carried it out of the store, pushing past an entering customer as he reached the door. After he was outside, Tucker heard a second shot from inside the store, and shortly thereafter Waxton emerged, carrying a handful of paper money. Tucker and Waxton got in the car and the four drove away.

The petitioners' testimony agreed in large part with this version of the circumstances of the robbery. It differed diametrically in one important respect: Waxton claimed that he never had a gun, and that Tucker had shot both the cashier and the customer.

During the trial Waxton asked to be allowed to plead guilty to the same lesser offenses to which Tucker had pleaded guilty,[1] but the solicitor refused to accept the pleas.[2] Woodson, by contrast, maintained throughout the trial that he had been coerced by Waxton, that he was therefore innocent, and that he would not consider pleading guilty to any offense.

The petitioners were found guilty on all charges,[3] and, as was required by statute, sentenced to death. The Supreme Court of North Carolina affirmed. 287 N. C. 578, 215 S. E. 2d 607 (1975). We granted certiorari, 423 U. S. 1082 (1976), to consider whether the imposition of the death penalties in this case comports with

---

[1] Tucker had been allowed to plead guilty to charges of accessory after the fact to murder and to armed robbery. He was sentenced to 10 years' imprisonment on the first charge, and to not less than 20 years nor more than 30 years on the second, the sentences to run concurrently.

[2] The solicitor gave no reason for refusing to accept Waxton's offer to plead guilty to a lesser offense. The Supreme Court of North Carolina, in finding that the solicitor had not abused his discretion, noted:

"The evidence that Waxton planned and directed the robbery and that he fired the shots which killed Mrs. Butler and wounded Mr. Stancil is overwhelming. No extenuating circumstances gave the solicitor any incentive to accept the plea he tendered at the close of the State's evidence." 287 N. C. 578, 595–596, 215 S. E. 2d 607, 618 (1975).

[3] In addition to first-degree murder, both petitioners were found guilty of armed robbery. Waxton was also found guilty of assault with a deadly weapon with intent to kill, a charge arising from the wounding of the customer.

the Eighth and Fourteenth Amendments to the United States Constitution.

## II

The petitioners argue that the imposition of the death penalty under any circumstances is cruel and unusual punishment in violation of the Eighth and Fourteenth Amendments. We reject this argument for the reasons stated today in *Gregg* v. *Georgia, ante,* at 168–187.

## III

At the time of this Court's decision in *Furman* v. *Georgia,* 408 U. S. 238 (1972), North Carolina law provided that in cases of first-degree murder, the jury in its unbridled discretion could choose whether the convicted defendant should be sentenced to death or to life imprisonment.[4] After the *Furman* decision the Supreme Court of North Carolina in *State* v. *Waddell,* 282 N. C. 431, 194 S. E. 2d 19 (1973), held unconstitutional the provision of the death penalty statute that gave the jury the option of returning a verdict of guilty without cap-

---

[4] The murder statute in effect in North Carolina until April 1974 read as follows:

"§ 14–17. Murder in the first and second degree defined; punishment.—A murder which shall be perpetrated by means of poison, lying in wait, imprisonment, starving, torture, or by any other kind of willful, deliberate and premeditated killing, or which shall be committed in the perpetration or attempt to perpetrate any arson, rape, robbery, burglary or other felony, shall be deemed to be murder in the first degree and shall be punished with death: Provided, if at the time of rendering its verdict in open court, the jury shall so recommend, the punishment shall be imprisonment for life in the State's prison, and the court shall so instruct the jury. All other kinds of murder shall be deemed murder in the second degree, and shall be punished with imprisonment of not less than two nor more than thirty years in the State's prison." N. C. Gen. Stat. § 14–17 (1969).

ital punishment, but held further that this provision was severable so that the statute survived as a mandatory death penalty law.[5]

The North Carolina General Assembly in 1974 followed the court's lead and enacted a new statute that was essentially unchanged from the old one except that it made the death penalty mandatory. The statute now reads as follows:

> "*Murder in the first and second degree defined; punishment.*—A murder which shall be perpetrated by means of poison, lying in wait, imprisonment, starving, torture, or by any other kind of willful, deliberate and premeditated killing, or which shall be committed in the perpetration or attempt to perpetrate any arson, rape, robbery, kidnapping, burglary or other felony, shall be deemed to be murder in the first degree and shall be punished with death. All other kinds of murder shall be deemed murder in the second degree, and shall be punished by imprisonment for a term of not less than two years nor more than life imprisonment in the State's prison."
> N. C. Gen. Stat. §14–17 (Cum. Supp. 1975).

It was under this statute that the petitioners, who committed their crime on June 3, 1974, were tried, convicted, and sentenced to death.

North Carolina, unlike Florida, Georgia, and Texas, has thus responded to the *Furman* decision by making death the mandatory sentence for all persons convicted

---

[5] The court characterized the effect of the statute without the invalid provision as follows:

"Upon the return of a verdict of guilty of any such offense, the court must pronounce a sentence of death. The punishment to be imposed for these capital felonies is no longer a discretionary question for the jury and therefore no longer a proper subject for an instruction by the judge." 282 N. C., at 445, 194 S. E. 2d, at 28–29.

of first-degree murder.[6]   In ruling on the constitution-
ality of the sentences imposed on the petitioners under
this North Carolina statute, the Court now addresses for
the first time the question whether a death sentence re-
turned pursuant to a law imposing a mandatory death
penalty for a broad category of homicidal offenses [7] con-
stitutes cruel and unusual punishment within the mean-
ing of the Eighth and Fourteenth Amendments.[8]   The
issue, like that explored in *Furman,* involves the proce-
dure employed by the State to select persons for the
unique and irreversible penalty of death.[9]

---

[6] North Carolina also has enacted a mandatory death sentence
statute for the crime of first-degree rape.   N. C. Gen. Stat. § 14–21
(Cum. Supp. 1975).

[7] This case does not involve a mandatory death penalty statute
limited to an extremely narrow category of homicide, such as murder
by a prisoner serving a life sentence, defined in large part in terms of
the character or record of the offender.   We thus express no opinion
regarding the constitutionality of such a statute.   See n. 25, *infra.*

[8] The Eighth Amendment's proscription of cruel and unusual pun-
ishments has been held to be applicable to the States through the
Fourteenth Amendment.   See *Robinson* v. *California,* 370 U. S.
660 (1962).

The Court's decision in *Furman* v. *Georgia,* 408 U. S. 238 (1972),
involved statutes providing for jury discretion in the imposition of
death sentences.   Several members of the Court in *Furman* ex-
pressly declined to state their views regarding the constitutionality
of mandatory death sentence statutes.   See *id.,* at 257 (Douglas, J.,
concurring); *id.,* at 307 (STEWART, J., concurring); *id.,* at 310–311
(WHITE, J., concurring).

[9] The petitioners here, as in the other four death penalty cases be-
fore the Court, contend that their sentences were imposed in viola-
tion of the Constitution because North Carolina has failed to elimi-
nate discretion from all phases of its procedure for imposing capital
punishment.   We have rejected similar claims today in *Gregg, Prof-
fitt,* and *Jurek.*   The mandatory nature of the North Carolina death
penalty statute for first-degree murder presents a different ques-
tion under the Eighth and Fourteenth Amendments.

## A

The Eighth Amendment stands to assure that the State's power to punish is "exercised within the limits of civilized standards." *Trop* v. *Dulles,* 356 U. S. 86, 100 (1958) (plurality opinion). See *id.,* at 101; *Weems* v. *United States,* 217 U. S. 349, 373, 378 (1910); *Louisiana ex rel. Francis* v. *Resweber,* 329 U. S. 459, 468–469 (1947) (Frankfurter, J., concurring); [10] *Robinson* v. *California,* 370 U. S. 660, 666 (1962); *Furman* v. *Georgia,* 408 U. S., at 242 (Douglas, J., concurring); *id.,* at 269–270 (BRENNAN, J., concurring); *id.,* at 329 (MARSHALL, J., concurring); *id.,* at 382–383 (BURGER, C. J., dissenting); *id.,* at 409 (BLACKMUN, J., dissenting); *id.,* at 428–429 (POWELL, J., dissenting). Central to the application of the Amendment is a determination of contemporary standards regarding the infliction of punishment. As discussed in *Gregg* v. *Georgia, ante,* at 176–182, indicia of societal values identified in prior opinions include history and traditional usage,[11] legislative enactments,[12] and jury determinations.[13]

---

[10] Mr. Justice Frankfurter contended that the Eighth Amendment did not apply to the States through the Fourteenth Amendment. He believed, however, that the Due Process Clause of the Fourteenth Amendment itself "expresses a demand for civilized standards." *Louisiana ex rel. Francis* v. *Resweber,* 329 U. S., at 468 (concurring opinion).

[11] See *Trop* v. *Dulles,* 356 U. S. at 99 (plurality opinion) (dictum). See also *Furman* v. *Georgia, supra,* at 291 (BRENNAN, J., concurring).

[12] See *Weems* v. *United States,* 217 U. S. 349, 377 (1910) (noting that the punishment of *cadena temporal* at issue in that case had "no fellow in American legislation"); *Furman* v. *Georgia, supra,* at 436–437 (POWELL, J., dissenting); *Gregg* v. *Georgia, ante,* at 179–181.

[13] See *Witherspoon* v. *Illinois,* 391 U. S. 510, 519, and n. 15 (1968); *McGautha* v. *California,* 402 U. S. 183, 201–202 (1971); *Furman* v. *Georgia, supra,* at 388 (BURGER, C. J., dissenting); *id.,* at 439–441 (POWELL, J., dissenting) ("Any attempt to discern, there-

In order to provide a frame for assessing the relevancy of these factors in this case we begin by sketching the history of mandatory death penalty statutes in the United States. At the time the Eighth Amendment was adopted in 1791, the States uniformly followed the common-law practice of making death the exclusive and mandatory sentence for certain specified offenses.[14] Although the range of capital offenses in the American Colonies was quite limited in comparison to the more than 200 offenses then punishable by death in England,[15] the Colonies at the time of the Revolution imposed death sentences on all persons convicted of any of a considerable number of crimes, typically including at a minimum, murder, treason, piracy, arson, rape, robbery, burglary, and sodomy.[16] As at common law, all homicides that were not involuntary, provoked, justified, or excused constituted murder and were automatically punished by death.[17] Almost from the outset jurors reacted unfavorably to the harshness of mandatory death sentences.[18] The States initially responded to this ex-

---

fore, where prevailing standards of decency lie must take careful account of the jury's response to the question of capital punishment").

[14] See H. Bedau, The Death Penalty in America 5–6, 15, 27–28 (rev. ed. 1967) (hereafter Bedau).

[15] See id., at 1–2; R. Bye, Capital Punishment in the United States 1–2 (1919) (hereafter Bye).

[16] See Bedau 6; Bye 2–3 (most New England Colonies made 12 offenses capital; Rhode Island, with 10 capital crimes, was the "mildest of all of the colonies"); Hartung, Trends in the Use of Capital Punishment, 284 Annals of Am. Academy of Pol. and Soc. Sci. 8, 10 (1952) ("The English colonies in this country had from ten to eighteen capital offenses").

[17] See Bedau 23–24.

[18] See id., at 27; Knowlton, Problems of Jury Discretion in Capital Cases, 101 U. Pa. L. Rev. 1099, 1102 (1953); Mackey, The Inutility of Mandatory Capital Punishment: An Historical Note,

pression of public dissatisfaction with mandatory statutes by limiting the classes of capital offenses.[19]

This reform, however, left unresolved the problem posed by the not infrequent refusal of juries to convict murderers rather than subject them to automatic death sentences. In 1794, Pennsylvania attempted to alleviate the undue severity of the law by confining the mandatory death penalty to "murder of the first degree" encompassing all "wilful, deliberate and premeditated" killings. Pa. Laws 1794 c. 1766.[20] Other jurisdictions, including Virginia and Ohio, soon enacted similar measures, and within a generation the practice spread to most of the States.[21]

Despite the broad acceptance of the division of murder into degrees, the reform proved to be an unsatisfactory means of identifying persons appropriately punishable by death. Although its failure was due in part to the amorphous nature of the controlling concepts of will-

---

54 B. U. L. Rev. 32 (1974); *McGautha* v. *California, supra,* at 198–199; *Andres* v. *United States,* 333 U. S. 740, 753 (1948) (Frankfurter, J., concurring); *Winston* v. *United States,* 172 U. S. 303, 310 (1899).

[19] See Bye 5. During the colonial period, Pennsylvania in 1682 under the Great Law of William Penn limited capital punishment to murder. Following Penn's death in 1718, however, Pennsylvania greatly expanded the number of capital offenses. See Hartung, *supra,* n. 16, at 9–10.

Many States during the early 19th century significantly reduced the number of crimes punishable by death. See Davis, The Movement to Abolish Capital Punishment in America, 1787–1861, 63 Am. Hist. Rev. 23, 27, and n. 15 (1957).

[20] See Bedau 24.

[21] See *ibid.;* Davis, *supra,* at 26–27, n. 13. By the late 1950's, some 34 States had adopted the Pennsylvania formulation, and only 10 States retained a single category of murder as defined at common law. See American Law Institute, Model Penal Code § 201.6, Comment 2, p. 66 (Tent. Draft No. 9, 1959).

fulness, deliberateness, and premeditation,[22] a more fundamental weakness of the reform soon became apparent. Juries continued to find the death penalty inappropriate in a significant number of first-degree murder cases and refused to return guilty verdicts for that crime.[23]

The inadequacy of distinguishing between murderers solely on the basis of legislative criteria narrowing the definition of the capital offense led the States to grant juries sentencing discretion in capital cases. Tennessee in 1838, followed by Alabama in 1841, and Louisiana in 1846, were the first States to abandon mandatory death sentences in favor of discretionary death penalty statutes.[24] This flexibility remedied the harshness of mandatory statutes by permitting the jury to respond to mitigating factors by withholding the death penalty. By the turn of the century, 23 States and the Federal Government had made death sentences discretionary for first-degree murder and other capital offenses. During the next two decades 14 additional States replaced their mandatory death penalty statutes. Thus, by the end of World War I, all but eight States, Hawaii, and the District of Columbia either had adopted discretionary death penalty schemes or abolished the death penalty altogether. By 1963, all of these remaining jurisdic-

---

[22] See *McGautha* v. *California, supra,* at 198–199.

[23] See Bedau 27; Mackey, *supra,* n. 18; *McGautha* v. *California, supra,* at 199.

[24] See Tenn. Laws 1837–1838, c. 29; Ala. Laws 1841; La. Laws 1846, Act No. 139. See also W. Bowers, Executions in America 7 (1974).

Prior to the Tennessee reform in 1838, Maryland had changed from a mandatory to an optional death sentence for the crimes of treason, rape, and arson. Md. Laws 1809, c. 138. For a time during the early colonial period Massachusetts, as part of its "Capitall Lawes" of 1636, apparently had a nonmandatory provision for the crime of rape. See Bedau 28.

tions had replaced their automatic death penalty statutes with discretionary jury sentencing.[25]

The history of mandatory death penalty statutes in

[25] See Bowers, *supra*, at 7–9 (Table 1–2 sets forth the date each State adopted discretionary jury sentencing); Brief for United States as *Amicus Curiae* in *McGautha* v. *California*, O. T. 1970, No. 70–203, App. B (listing statutes in each State initially introducing discretionary jury sentencing in capital cases), App. C (listing state statutes in force in 1970 providing for discretionary jury sentencing in capital murder cases).

Prior to this Court's 1972 decision in *Furman* v. *Georgia*, 408 U. S. 238, there remained a handful of obscure statutes scattered among the penal codes in various States that required an automatic death sentence upon conviction of a specified offense. These statutes applied to such esoteric crimes as trainwrecking resulting in death, perjury in a capital case resulting in the execution of an innocent person, and treason against a state government. See Bedau 46–47 (1964 compilation). The most prevalent of these statutes dealt with the crime of treason against state governments. *Ibid.* It appears that no one has ever been prosecuted under these or other state treason laws. See Hartung, *supra*, n. 16, at 10. See also T. Sellin, The Death Penalty, A Report for the Model Penal Code Project of the American Law Institute 1 (1959) (discussing the Michigan statute, subsequently repealed in 1963, and the North Dakota statute). Several States retained mandatory death sentences for perjury in capital cases resulting in the execution of an innocent person. Data covering the years from 1930 to 1961 indicate, however, that no State employed its capital perjury statute during that period. See Bedau 46.

The only category of mandatory death sentence statutes that appears to have had any relevance to the actual administration of the death penalty in the years preceding *Furman* concerned the crimes of murder or assault with a deadly weapon by a life-term prisoner. Statutes of this type apparently existed in five States in 1964. See *id.*, at 46–47. In 1970, only five of the more than 550 prisoners under death sentence across the country had been sentenced under a mandatory death penalty statute. Those prisoners had all been convicted under the California statute applicable to assaults by life-term prisoners. See Brief For NAACP Legal Defense and Educational Fund, Inc., et al., as *Amici Curiae* in *McGautha* v. *California*, O. T. 1970, No. 70–203, p. 15 n. 19. We have no occasion in

the United States thus reveals that the practice of sentencing to death all persons convicted of a particular offense has been rejected as unduly harsh and unworkably rigid. The two crucial indicators of evolving standards of decency respecting the imposition of punishment in our society—jury determinations and legislative enactments—both point conclusively to the repudiation of automatic death sentences. At least since the Revolution, American jurors have, with some regularity, disregarded their oaths and refused to convict defendants where a death sentence was the automatic consequence of a guilty verdict. As we have seen, the initial movement to reduce the number of capital offenses and to separate murder into degrees was prompted in part by the reaction of jurors as well as by reformers who objected to the imposition of death as the penalty for any crime. Nineteenth century journalists, statesmen, and jurists repeatedly observed that jurors were often deterred from convicting palpably guilty men of first-degree murder under mandatory statutes.[26] Thereafter, continuing evidence of jury reluctance to convict persons of capital offenses in mandatory death penalty jurisdictions resulted in legislative authorization of discretionary jury sentencing—by Congress for federal crimes in 1897,[27] by North Carolina in 1949,[28] and by Congress for the District of Columbia in 1962.[29]

---

this case to examine the constitutionality of mandatory death sentence statutes applicable to prisoners serving life sentences.

[26] See Mackey, *supra*, n. 18.

[27] See H. R. Rep. No. 108, 54th Cong., 1st Sess., 2 (1896) (noting that the modification of the federal capital statutes to make the death penalty discretionary was in harmony with "a growing public sentiment," quoting H. R. Rep. No. 545, 53d Cong., 2d Sess., 1 (1894)); S. Rep. No. 846, 53d Cong., 3d Sess. (1895).

As we have noted today in *Gregg* v. *Georgia, ante,* at 179–181, legislative measures adopted by the people's chosen representatives weigh heavily in ascertaining con-

[28] See Report of the Special Commission for the Improvement of the Administration of Justice, North Carolina, Popular Government 13 (Jan. 1949).

[29] See unpublished Hearings on S. 138 before the Subcommittee on the Judiciary of the Senate Committee on the District of Columbia 19–20 (May 17, 1961) (testimony of Sen. Keating). Data compiled by a former United States Attorney for the District of Columbia indicated that juries convicted defendants of first-degree murder in only 12 of the 60 jury trials for first-degree murder held in the District of Columbia between July 1, 1953, and February 1960. *Ibid.* The conviction rate was "substantially below the general average in prosecuting other crimes." *Id.,* at 20. The lower conviction rate was attributed to the reluctance of jurors to impose the harsh consequences of a first-degree murder conviction in cases where the record might justify a lesser punishment. *Ibid.* See McCafferty, Major Trends in the Use of Capital Punishment, 1 Am. Crim. L. Q. No. 2, pp. 9, 14–15 (1963) (discussing a similar study of first-degree murder cases in the District of Columbia during the period July 1, 1947, through June 30, 1958).

A study of the death penalty submitted to the American Law Institute noted that juries in Massachusetts and Connecticut had "for many years" resorted to second-degree murder convictions to avoid the consequences of those States' mandatory death penalty statutes for first-degree murder, prior to their replacement with discretionary sentencing in 1951. See Sellin, *supra,* n. 25, at 13.

A 1973 Pennsylvania legislative report surveying the available literature analyzing mandatory death sentence statutes concluded:

"Although the data collection techniques in some instances are weak, the uniformity of the conclusions in substantiating what these authors termed 'jury nullification' (i. e. refusal to convict because of the required penalty) is impressive. Authors on both sides of the capital punishment debate reached essentially the same conclusions. Authors writing about the mandatory death penalty who wrote in 1892 reached the same conclusions as persons writing in the 1950's and 1960's." McCloskey, A Review of the Literature Contrasting Mandatory and Discretionary Systems of Sentencing Capital Cases, in Report of the Governor's Study Commission on Capital Punishment 100, 101 (Pa., 1973).

temporary standards of decency. The consistent course charted by the state legislatures and by Congress since the middle of the past century demonstrates that the aversion of jurors to mandatory death penalty statutes is shared by society at large.[30]

Still further evidence of the incompatibility of mandatory death penalties with contemporary values is provided by the results of jury sentencing under discretionary statutes. In *Witherspoon* v. *Illinois,* 391 U. S. 510 (1968), the Court observed that "one of the most important functions any jury can perform" in exercising its discretion to choose "between life imprisonment and capital punishment" is "to maintain a link between contemporary community values and the penal system." *Id.,* at 519, and n. 15. Various studies indicate that even in first-degree murder cases juries with sentencing discretion do not impose the death penalty "with any great frequency." H. Kalven & H. Zeisel, The American Jury 436 (1966).[31] The actions of sentencing juries sug-

---

[30] Not only have mandatory death sentence laws for murder been abandoned by legislature after legislature since Tennessee replaced its mandatory statute 138 years ago, but, with a single exception, no State prior to this Court's *Furman* decision in 1972 ever returned to a mandatory scheme after adopting discretionary sentencing. See Bedau 30; Bowers, *supra,* n. 29, at 9. Vermont, which first provided for jury discretion in 1911, was apparently prompted to return to mandatory sentencing by a "veritable crime wave of twenty murders" in 1912. See Bedau 30. Vermont reinstituted discretionary jury sentencing in 1957.

[31] Data compiled on discretionary jury sentencing of persons convicted of capital murder reveal that the penalty of death is generally imposed in less than 20% of the cases. See *Furman* v. *Georgia,* 408 U. S., at 386–387, n. 11 (BURGER, C. J., dissenting); *id.,* at 435–436, n. 19 (POWELL, J., dissenting); Brief for Petitioner in *Aikens* v. *California,* O. T. 1971, No. 68–5027, App. F (collecting data from a number of jurisdictions indicating that the per-

gest that under contemporary standards of decency death is viewed as an inappropriate punishment for a substantial portion of convicted first-degree murderers.

Although the Court has never ruled on the constitutionality of mandatory death penalty statutes, on several occasions dating back to 1899 it has commented upon our society's aversion to automatic death sentences. In *Winston* v. *United States,* 172 U. S. 303 (1899), the Court noted that the "hardship of punishing with death every crime coming within the definition of murder at common law, and the reluctance of jurors to concur in a capital conviction, have induced American legislatures, in modern times, to allow some cases of murder to be punished by imprisonment, instead of by death." *Id.,* at 310.[32] Fifty years after *Winston,* the Court underscored the marked transformation in our attitudes toward mandatory sentences: "The belief no longer prevails that every offense in a like legal category calls for an identical

centage of death sentences in many States was well below 20%). Statistics compiled by the Department of Justice show that only 66 convicted murderers were sentenced to death in 1972. See Law Enforcement Assistance Administration, Capital Punishment, 1971–1972, Table 7a (National Prisoner Statistics Bulletin Dec. 1974). (The figure does not include persons retained in local facilities during the pendency of their appeals.)

[32] Later, in *Andres* v. *United States,* Mr. Justice Frankfurter observed that the 19th century movement leading to the passage of legislation providing for discretionary sentencing in capital cases "was impelled both by ethical and humanitarian arguments against capital punishment, as well as by the practical consideration that jurors were reluctant to bring in verdicts which inevitably called for its infliction." 333 U. S., at 753 (concurring opinion). The Court in *Andres* noted that the decision of Congress at the end of the 19th century to replace mandatory death sentences with discretionary jury sentencing for federal capital crimes was prompted by "[d]issatisfaction over the harshness and antiquity of the federal criminal laws." *Id.,* at 747–748, n. 11.

punishment without regard to the past life and habits of a particular offender. This whole country has traveled far from the period in which the death sentence was an automatic and commonplace result of convictions . . . ." *Williams* v. *New York*, 337 U. S. 241, 247 (1949).

More recently, the Court in *McGautha* v. *California*, 402 U. S. 183 (1971), detailed the evolution of discretionary imposition of death sentences in this country, prompted by what it termed the American "rebellion against the common-law rule imposing a mandatory death sentence on all convicted murderers." *Id.*, at 198. See *id.*, at 198–202. Perhaps the one important factor about evolving social values regarding capital punishment upon which the Members of the *Furman* Court agreed was the accuracy of *McGautha*'s assessment of our Nation's rejection of mandatory death sentences. See *Furman* v. *Georgia*, 408 U. S., at 245–246 (Douglas, J., concurring); *id.*, at 297–298 (BRENNAN, J., concurring); *id.*, at 339 (MARSHALL, J., concurring); *id.*, at 402–403 (BURGER, C. J., with whom BLACKMUN, POWELL, and REHNQUIST, JJ., joined, dissenting); *id.*, at 413 (BLACKMUN, J., dissenting). MR. JUSTICE BLACKMUN, for example, emphasized that legislation requiring an automatic death sentence for specified crimes would be "regressive and of an antique mold" and would mark a return to a "point in our criminology [passed beyond] long ago." *Ibid.* THE CHIEF JUSTICE, speaking for the four dissenting Justices in *Furman*, discussed the question of mandatory death sentences at some length:

> "I had thought that nothing was clearer in history, as we noted in *McGautha* one year ago, than the American abhorrence of 'the common-law rule imposing a mandatory death sentence on all convicted murderers.' 402 U. S., at 198. As the concurring opinion of MR. JUSTICE MARSHALL shows, [408

U. S.,] at 339, the 19th century movement away from mandatory death sentences marked an enlightened introduction of flexibility into the sentencing process. It recognized that individual culpability is not always measured by the category of the crime committed. This change in sentencing practice was greeted by the Court as a humanizing development. See *Winston* v. *United States,* 172 U. S. 303 (1899); cf. *Calton* v. *Utah,* 130 U. S. 83 (1889). See also *Andres* v. *United States,* 333 U. S. 740, 753 (1948) (Frankfurter, J., concurring)." *Id.,* at 402.

Although it seems beyond dispute that, at the time of the *Furman* decision in 1972, mandatory death penalty statutes had been renounced by American juries and legislatures, there remains the question whether the mandatory statutes adopted by North Carolina and a number of other States following *Furman* evince a sudden reversal of societal values regarding the imposition of capital punishment. In view of the persistent and unswerving legislative rejection of mandatory death penalty statutes beginning in 1838 and continuing for more than 130 years until *Furman,*[33] it seems evident that the post-*Furman* enactments reflect attempts by the States to retain the death penalty in a form consistent with the Constitution, rather than a renewed societal acceptance of mandatory death sentencing.[34] The fact that some

---

[33] See n. 30, *supra.*

[34] A study of public opinion polls on the death penalty concluded that "despite the increasing approval for the death penalty reflected in opinion polls during the last decade, there is evidence that many people supporting the general idea of capital punishment want its administration to depend on the circumstances of the case, the character of the defendant, or both." Vidmar & Ellsworth, Public Opinion and the Death Penalty, 26 Stan. L. Rev. 1245, 1267 (1974). One poll discussed by the authors revealed that a "substantial majority" of persons opposed mandatory capital punish-

States have adopted mandatory measures following *Furman* while others have legislated standards to guide jury discretion appears attributable to diverse readings of this Court's multi-opinioned decision in that case.[35]

A brief examination of the background of the current North Carolina statute serves to reaffirm our assessment of its limited utility as an indicator of contemporary values regarding mandatory death sentences. Before 1949, North Carolina imposed a mandatory death sentence on any person convicted of rape or first-degree murder. That year, a study commission created by the state legislature recommended that juries be granted discretion to recommend life sentences in all capital cases:

> "We propose that a recommendation of mercy by the jury in capital cases automatically carry with it a life sentence. Only three other states now have the mandatory death penalty and we believe its retention will be definitely harmful. Quite frequently, juries refuse to convict for rape or first degree murder because, from all the circumstances, they do not believe the defendant, although guilty, should suffer death. The result is that verdicts are returned hardly in harmony with evidence. Our

ment. *Id.*, at 1253. Moreover, the public through the jury system has in recent years applied the death penalty in anything but a mandatory fashion. See n. 31, *supra.*

[35] The fact that, as MR. JUSTICE REHNQUIST's dissent properly notes, some States "preferred mandatory capital punishment to no capital punishment at all," *post*, at 313, is entitled to some weight. But such an artificial choice merely establishes a desire for some form of capital punishment; it is hardly "utterly inconsistent with the notion that [those States] regarded mandatory capital sentencing as beyond 'evolving standards of decency.'" *Ibid.* It says no more about contemporary values than would the decision of a State, thinking itself faced with a choice between a barbarous punishment and no punishment at all, to choose the former.

proposal is already in effect in respect to the crimes of burglary and arson. There is much testimony that it has proved beneficial in such cases. We think the law can now be broadened to include all capital crimes." Report of the Special Commission For the Improvement of the Administration of Justice, North Carolina, Popular Government 13 (Jan. 1949).

The 1949 session of the General Assembly of North Carolina adopted the proposed modifications of its rape and murder statutes. Although in subsequent years numerous bills were introduced in the legislature to limit further or abolish the death penalty in North Carolina, they were rejected as were two 1969 proposals to return to mandatory death sentences for all capital offenses. See *State* v. *Waddell,* 282 N. C., at 441, 194 S. E. 2d, at 26 (opinion of the court); *id.,* at 456–457, 194 S. E. 2d, at 32–33 (Bobbitt, C. J., concurring in part and dissenting in part).

As noted, *supra,* at 285–286, when the Supreme Court of North Carolina analyzed the constitutionality of the State's death penalty statute following this Court's decision in *Furman,* it severed the 1949 proviso authorizing jury sentencing discretion and held that "the remainder of the statute with death as the mandatory punishment . . . remains in full force and effect." *State* v. *Waddell, supra,* at 444–445, 194 S. E. 2d, at 28. The North Carolina General Assembly then followed the course found constitutional in *Waddell* and enacted a first-degree murder provision identical to the mandatory statute in operation prior to the authorization of jury discretion. The State's brief in this case relates that the legislature sought to remove *"all* sentencing discretion [so that] there could be no successful *Furman* based attack on the North Carolina statute."

It is now well established that the Eighth Amendment draws much of its meaning from "the evolving standards of decency that mark the progress of a maturing society." *Trop* v. *Dulles,* 356 U. S., at 101 (plurality opinion). As the above discussion makes clear, one of the most significant developments in our society's treatment of capital punishment has been the rejection of the common-law practice of inexorably imposing a death sentence upon every person convicted of a specified offense. North Carolina's mandatory death penalty statute for first-degree murder departs markedly from contemporary standards respecting the imposition of the punishment of death and thus cannot be applied consistently with the Eighth and Fourteenth Amendments' requirement that the State's power to punish "be exercised within the limits of civilized standards." *Id.,* at 100.[36]

---

[36] Dissenting opinions in this case and in *Roberts* v. *Louisiana, post,* p. 325, argue that this conclusion is "simply mistaken" because the American rejection of mandatory death sentence statutes might possibly be ascribable to "some maverick juries or jurors." *Post,* at 309, 313 (REHNQUIST, J., dissenting). See *Roberts* v. *Louisiana, post,* at 361 (WHITE, J., dissenting). Since acquittals no less than convictions required unanimity and citizens with moral reservations concerning the death penalty were regularly excluded from capital juries, it seems hardly conceivable that the persistent refusal of American juries to convict palpably guilty defendants of capital offenses under mandatory death sentence statutes merely "represented the intransigence of only a small minority" of jurors. *Post,* at 312 (REHNQUIST, J., dissenting). Moreover, the dissenting opinions simply ignore the experience under discretionary death sentence statutes indicating that juries reflecting contemporary community values, *Witherspoon* v. *Illinois,* 391 U. S., at 519, and n. 15, found the death penalty appropriate for only a small minority of convicted first-degree murderers. See n. 31, *supra.* We think it evident that the uniform assessment of the historical record by Members of this Court beginning in 1899 in *Winston* v. *United States,* 172 U. S. 303 (1899), and continuing through the dissenting opin-

## B

A separate deficiency of North Carolina's mandatory death sentence statute is its failure to provide a constitutionally tolerable response to *Furman*'s rejection of unbridled jury discretion in the imposition of capital sentences. Central to the limited holding in *Furman* was the conviction that the vesting of standardless sentencing power in the jury violated the Eighth and Fourteenth Amendments. See *Furman* v. *Georgia*, 408 U. S., at 309–310 (STEWART, J., concurring); *id.*, at 313 (WHITE, J., concurring); cf. *id.*, at 253–257 (Douglas, J., concurring). See also *id.*, at 398–399 (BURGER, C. J., dissenting). It is argued that North Carolina has remedied the inadequacies of the death penalty statutes held unconstitutional in *Furman* by withdrawing all sentencing discretion from juries in capital cases. But when one considers the long and consistent American experience with the death penalty in first-degree murder cases, it becomes evident that mandatory statutes enacted in response to *Furman* have simply papered over the problem of unguided and unchecked jury discretion.

As we have noted in Part III–A, *supra*, there is general agreement that American juries have persistently refused to convict a significant portion of persons charged with first-degree murder of that offense under mandatory death penalty statutes. The North Carolina study commission, *supra*, at 299–300, reported that juries in that State "[q]uite frequently" were deterred from rendering guilty verdicts of first-degree murder because of the enormity of the sentence automatically imposed. Moreover,

---

ions of THE CHIEF JUSTICE and MR. JUSTICE BLACKMUN four years ago in *Furman*, see *supra*, at 296–298, and n. 32, provides a far more cogent and persuasive explanation of the American rejection of mandatory death sentences than do the speculations in today's dissenting opinions.

as a matter of historic fact, juries operating under discretionary sentencing statutes have consistently returned death sentences in only a minority of first-degree murder cases.[37]   In view of the historic record, it is only reasonable to assume that many juries under mandatory statutes will continue to consider the grave consequences of a conviction in reaching a verdict.   North Carolina's mandatory death penalty statute provides no standards to guide the jury in its inevitable exercise of the power to determine which first-degree murderers shall live and which shall die.   And there is no way under the North Carolina law for the judiciary to check arbitrary and capricious exercise of that power through a review of death sentences.[38]   Instead of rationalizing the sentencing process, a mandatory scheme may well exacerbate the problem identified in *Furman* by resting the penalty determination on the particular jury's willingness to act lawlessly.   While a mandatory death penalty statute may reasonably be expected to increase the number of persons sentenced to death, it does not fulfill *Furman*'s basic requirement by replacing arbitrary and wanton jury discretion with objective standards to guide, regularize, and make rationally reviewable the process for imposing a sentence of death.

## C

A third constitutional shortcoming of the North Carolina statute is its failure to allow the particularized consideration of relevant aspects of the character and record of each convicted defendant before the imposition upon him of a sentence of death.   In *Furman*, members of the Court acknowledged what cannot fairly be denied—that death is a punishment different from all other

[37] See n. 31, *supra.*
[38] See *Gregg* v. *Georgia, ante,* at 204–206.

sanctions in kind rather than degree. See 408 U. S., at 286–291 (BRENNAN, J., concurring); *id.*, at 306 (STEWART, J., concurring). A process that accords no significance to relevant facets of the character and record of the individual offender or the circumstances of the particular offense excludes from consideration in fixing the ultimate punishment of death the possibility of compassionate or mitigating factors stemming from the diverse frailties of humankind. It treats all persons convicted of a designated offense not as uniquely individual human beings, but as members of a faceless, undifferentiated mass to be subjected to the blind infliction of the penalty of death.

This Court has previously recognized that "[f]or the determination of sentences, justice generally requires consideration of more than the particular acts by which the crime was committed and that there be taken into account the circumstances of the offense together with the character and propensities of the offender." *Pennsylvania ex rel. Sullivan* v. *Ashe,* 302 U. S. 51, 55 (1937). Consideration of both the offender and the offense in order to arrive at a just and appropriate sentence has been viewed as a progressive and humanizing development. See *Williams* v. *New York,* 337 U. S., at 247–249; *Furman* v. *Georgia,* 408 U. S., at 402–403 (BURGER, C. J., dissenting). While the prevailing practice of individualizing sentencing determinations generally reflects simply enlightened policy rather than a constitutional imperative, we believe that in capital cases the fundamental respect for humanity underlying the Eighth Amendment, see *Trop* v. *Dulles,* 356 U. S., at 100 (plurality opinion), requires consideration of the character and record of the individual offender and the circumstances of the particular offense as a constitutionally indispensable part of the process of inflicting the penalty of death.

This conclusion rests squarely on the predicate that the penalty of death is qualitatively different from a sentence of imprisonment, however long. Death, in its finality, differs more from life imprisonment than a 100-year prison term differs from one of only a year or two. Because of that qualitative difference, there is a corresponding difference in the need for reliability in the determination that death is the appropriate punishment in a specific case.[39]

For the reasons stated, we conclude that the death sentences imposed upon the petitioners under North Carolina's mandatory death sentence statute violated the Eighth and Fourteenth Amendments and therefore must be set aside.[40] The judgment of the Supreme Court of North Carolina is reversed insofar as it upheld the death sentences imposed upon the petitioners, and the case is remanded for further proceedings not inconsistent with this opinion.

*It is so ordered.*

MR. JUSTICE BRENNAN, concurring in the judgment.

For the reasons stated in my dissenting opinion in *Gregg* v. *Georgia, ante,* p. 227, I concur in the judgment

---

[39] MR. JUSTICE REHNQUIST's dissenting opinion proceeds on the faulty premise that if, as we hold in *Gregg* v. *Georgia, ante,* p. 153, the penalty of death is not invariably a cruel and unusual punishment for the crime of murder, then it must be a proportionate and appropriate punishment for any and every murderer regardless of the circumstances of the crime and the character and record of the offender. See *post,* at 322–324.

[40] Our determination that the death sentences in this case were imposed under procedures that violated constitutional standards makes it unnecessary to reach the question whether imposition of the death penalty on petitioner Woodson would have been so disproportionate to the nature of his involvement in the capital offense as independently to violate the Eighth and Fourteenth Amendments. See *Gregg* v. *Georgia, ante,* at 187.

that sets aside the death sentences imposed under the North Carolina death sentence statute as violative of the Eighth and Fourteenth Amendments.

MR. JUSTICE MARSHALL, concurring in the judgment.

For the reasons stated in my dissenting opinion in *Gregg* v. *Georgia, ante,* p. 231, I am of the view that the death penalty is a cruel and unusual punishment forbidden by the Eighth and Fourteenth Amendments. I therefore concur in the Court's judgment.

MR. JUSTICE WHITE, with whom THE CHIEF JUSTICE and MR. JUSTICE REHNQUIST join, dissenting.

Following *Furman* v. *Georgia,* 408 U. S. 238 (1972), the North Carolina Supreme Court considered the effect of that case on the North Carolina criminal statutes which imposed the death penalty for first-degree murder and other crimes but which provided that "if at the time of rendering its verdict in open court, the jury shall so recommend, the punishment shall be imprisonment for life in the State's prison, and the court shall so instruct the jury." *State* v. *Waddell,* 282 N. C. 431, 194 S. E. 2d 19 (1973), determined that *Furman* v. *Georgia* invalidated only the proviso giving the jury the power to limit the penalty to life imprisonment and that thenceforward death was the mandatory penalty for the specified capital crimes. Thereafter N. C. Gen. Stat. § 14–17 was amended to eliminate the express dispensing power of the jury and to add kidnaping to the underlying felonies for which death is the specified penalty. As amended in 1974, the section reads as follows:

"A murder which shall be perpetrated by means of poison, lying in wait, imprisonment, starving, torture, or by any other kind of willful, deliberate and premeditated killing, or which shall be committed

in the perpetration or attempt to perpetrate any arson, rape, robbery, kidnapping, burglary or other felony, shall be deemed to be murder in the first degree and shall be punished with death. All other kinds of murder shall be deemed murder in the second degree, and shall be punished by imprisonment for a term of not less than two years nor more than life imprisonment in the State's prison."

It was under this statute that the petitioners in this case were convicted of first-degree murder and the mandatory death sentences imposed.

The facts of record and the proceedings in this case leading to petitioners' convictions for first-degree murder and their death sentences appear in the opinion of MR. JUSTICE STEWART, MR. JUSTICE POWELL, and MR. JUSTICE STEVENS. The issues in the case are very similar, if not identical, to those in *Roberts* v. *Louisiana, post,* p. 325. For the reasons stated in my dissenting opinion in that case, I reject petitioners' arguments that the death penalty in any circumstances is a violation of the Eighth Amendment and that the North Carolina statute, although making the imposition of the death penalty mandatory upon proof of guilt and a verdict of first-degree murder, will nevertheless result in the death penalty being imposed so seldom and arbitrarily that it is void under *Furman* v. *Georgia.* As is also apparent from my dissenting opinion in *Roberts* v. *Louisiana,* I also disagree with the two additional grounds which the plurality *sua sponte* offers for invalidating the North Carolina statute. I would affirm the judgment of the North Carolina Supreme Court.

MR. JUSTICE BLACKMUN, dissenting.

I dissent for the reasons set forth in my dissent in *Furman* v. *Georgia,* 408 U. S. 238, 405–414 (1972), and

in the other dissenting opinions I joined in that case. *Id.*, at 375, 414, and 465.

MR. JUSTICE REHNQUIST, dissenting.

I

The difficulties which attend the plurality's explanation for the result it reaches tend at first to obscure difficulties at least as significant which inhere in the unarticulated premises necessarily underlying that explanation. I advert to the latter only briefly, in order to devote the major and following portion of this dissent to those issues which the plurality actually considers.

As an original proposition, it is by no means clear that the prohibition against cruel and unusual punishments embodied in the Eighth Amendment, and made applicable to the States by the Fourteenth Amendment, *Robinson* v. *California,* 370 U. S. 660 (1962), was not limited to those punishments deemed cruel and unusual at the time of the adoption of the Bill of Rights. *McGautha* v. *California,* 402 U. S. 183, 225 (1971) (opinion of Black, J.). If *Weems* v. *United States,* 217 U. S. 349 (1910), dealing not with the Eighth Amendment but with an identical provision contained in the Philippine Constitution, and the plurality opinion in *Trop* v. *Dulles,* 356 U. S. 86 (1958), are to be taken as indicating the contrary, they should surely be weighed against statements in cases such as *Wilkerson* v. *Utah,* 99 U. S. 130 (1879); *In re Kemmler,* 136 U. S. 436 (1890); *Louisiana ex rel. Francis* v. *Resweber,* 329 U. S. 459, 464 (1947), and the plurality opinion in *Trop* itself, that the infliction of capital punishment is not in itself violative of the Cruel and Unusual Punishments Clause. Thus for the plurality to begin its analysis with the assumption that it need only demonstrate that "evolving standards of decency" show that contemporary "so-

ciety" has rejected such provisions is itself a somewhat shaky point of departure. But even if the assumption be conceded, the plurality opinion's analysis nonetheless founders.

The plurality relies first upon its conclusion that society has turned away from the mandatory imposition of death sentences, and second upon its conclusion that the North Carolina system has "simply papered over" the problem of unbridled jury discretion which two of the separate opinions in *Furman* v. *Georgia,* 408 U. S. 238 (1972), identified as the basis for the judgment rendering the death sentences there reviewed unconstitutional. The third "constitutional shortcoming" of the North Carolina statute is said to be "its failure to allow the particularized consideration of relevant aspects of the character and record of each convicted defendant before the imposition upon him of a sentence of death." *Ante,* at 303.

I do not believe that any one of these reasons singly, or all of them together, can withstand careful analysis. Contrary to the plurality's assertions, they would import into the Cruel and Unusual Punishments Clause procedural requirements which find no support in our cases. Their application will result in the invalidation of a death sentence imposed upon a defendant convicted of first-degree murder under the North Carolina system, and the upholding of the same sentence imposed on an identical defendant convicted on identical evidence of first-degree murder under the Florida, Georgia, or Texas systems—a result surely as "freakish" as that condemned in the separate opinions in *Furman.*

## II

The plurality is simply mistaken in its assertion that "[t]he history of mandatory death penalty statutes in the United States thus reveals that the practice of sen-

tencing to death all persons convicted of a particular offense has been rejected as unduly harsh and unworkably rigid." *Ante,* at 292–293. This conclusion is purportedly based on two historic developments: the first a series of legislative decisions during the 19th century narrowing the class of offenses punishable by death; the second a series of legislative decisions during both the 19th and 20th centuries, through which mandatory imposition of the death penalty largely gave way to jury discretion in deciding whether or not to impose this ultimate sanction. The first development may have some relevance to the plurality's argument in general but has no bearing at all upon this case. The second development, properly analyzed, has virtually no relevance even to the plurality's argument.

There can be no question that the legislative and other materials discussed in the plurality's opinion show a widespread conclusion on the part of state legislatures during the 19th century that the penalty of death was being required for too broad a range of crimes, and that these legislatures proceeded to narrow the range of crimes for which such penalty could be imposed. If this case involved the imposition of the death penalty for an offense such as burglary or sodomy, see *ante,* at 289, the virtually unanimous trend in the legislatures of the States to exclude such offenders from liability for capital punishment might bear on the plurality's Eighth Amendment argument. But petitioners were convicted of first-degree murder, and there is not the slightest suggestion in the material relied upon by the plurality that there had been any turning away at all, much less any such unanimous turning away, from the death penalty as a punishment for those guilty of first-degree murder. The legislative narrowing of the spectrum of capital crimes, therefore, while very arguably representing a general societal judgment since the trend was so widespread, simply never

reached far enough to exclude the sort of aggravated homicide of which petitioners stand convicted.

The second string to the plurality's analytical bow is that legislative change from mandatory to discretionary imposition of the death sentence likewise evidences societal rejection of mandatory death penalties. The plurality simply does not make out this part of its case, however, in large part because it treats as being of equal dignity with legislative judgments the judgments of particular juries and of individual jurors.

There was undoubted dissatisfaction, from more than one sector of 19th century society, with the operation of mandatory death sentences. One segment of that society was totally opposed to capital punishment, and was apparently willing to accept the substitution of discretionary imposition of that penalty for its mandatory imposition as a halfway house on the road to total abolition. Another segment was equally unhappy with the operation of the mandatory system, but for an entirely different reason. As the plurality recognizes, this second segment of society was unhappy with the operation of the mandatory system, not because of the death sentences imposed under it, but because people obviously guilty of criminal offenses were *not* being convicted under it. See *ante,* at 293. Change to a discretionary system was accepted by these persons not because they thought mandatory imposition of the death penalty was cruel and unusual, but because they thought that if jurors were permitted to return a sentence other than death upon the conviction of a capital crime, fewer guilty defendants would be acquitted. See *McGautha,* 402 U. S., at 199.

So far as the action of juries is concerned, the fact that in some cases juries operating under the mandatory system refused to convict obviously guilty defendants does not reflect any "turning away" from the death penalty, or the mandatory death penalty, supporting the

proposition that it is "cruel and unusual." Given the requirement of unanimity with respect to jury verdicts in capital cases, a requirement which prevails today in States which accept a nonunanimous verdict in the case of other crimes, see *Johnson* v. *Louisiana,* 406 U. S. 356, 363–364 (1972), it is apparent that a single juror could prevent a jury from returning a verdict of conviction. Occasional refusals to convict, therefore, may just as easily have represented the intransigence of only a small minority of 12 jurors as well as the unanimous judgment of all 12. The fact that the presence of such jurors could prevent conviction in a given case, even though the majority of society, speaking through legislatures, had decreed that it should be imposed, certainly does not indicate that society as a whole rejected mandatory punishment for such offenders; it does not even indicate that those few members of society who serve on juries, as a whole, had done so.

The introduction of discretionary sentencing likewise creates no inference that contemporary society had rejected the mandatory system as unduly severe. Legislatures enacting discretionary sentencing statutes had no reason to think that there would not be roughly the same number of capital convictions under the new system as under the old. The same subjective juror responses which resulted in juror nullification under the old system were legitimized, but in the absence of those subjective responses to a particular set of facts, a capital sentence could as likely be anticipated under the discretionary system as under the mandatory. And at least some of those who would have been acquitted under the mandatory system would be subjected to at least *some* punishment under the discretionary system, rather than escaping altogether a penalty for the crime of which they were guilty. That society was unwilling to accept the

paradox presented to it by the actions of some maverick juries or jurors—the acquittal of palpably guilty defendants—hardly reflects the sort of an "evolving standard of decency" to which the plurality professes obeisance.

Nor do the opinions in *Furman* which indicate a preference for discretionary sentencing in capital cases suggest in the slightest that a mandatory sentencing procedure would be cruel and unusual. The plurality concedes, as it must, that following *Furman* 10 States enacted laws providing for mandatory capital punishment. See State Capital Punishment Statutes Enacted Subsequent to *Furman* v. *Georgia,* Congressional Research Service Pamphlet 17–22 (June 19, 1974). These enactments the plurality seeks to explain as due to a wrongheaded reading of the holding in *Furman.* But this explanation simply does not wash. While those States may be presumed to have preferred their prior systems reposing sentencing discretion in juries or judges, they indisputably preferred mandatory capital punishment to no capital punishment at all. Their willingness to enact statutes providing that penalty is utterly inconsistent with the notion that they regarded mandatory capital sentencing as beyond "evolving standards of decency." The plurality's glib rejection of *these* legislative decisions as having little weight on the scale which it finds in the Eighth Amendment seems to me more an instance of its desire to save the people from themselves than a conscientious effort to ascertain the content of any "evolving standard of decency."

## III

The second constitutional flaw which the plurality finds in North Carolina's mandatory system is that it has simply "papered over" the problem of unchecked

jury discretion. The plurality states, *ante,* at 302, that "there is general agreement that American juries have persistently refused to convict a significant portion of persons charged with first-degree murder of that offense under mandatory death penalty statutes." The plurality also states, *ante,* at 303, that "as a matter of historic fact, juries operating under discretionary sentencing statutes have consistently returned death sentences in only a minority of first degree murder cases." The basic factual assumption of the plurality seems to be that for any given number of first-degree murder defendants subject to capital punishment, there will be a certain number of jurors who will be unwilling to impose the death penalty even though they are entirely satisfied that the necessary elements of the substantive offense are made out.

In North Carolina jurors unwilling to impose the death penalty may simply hang a jury or they may so assert themselves that a verdict of not guilty is brought in; in Louisiana they will have a similar effect in causing some juries to bring in a verdict of guilty of a lesser included offense even though all the jurors are satisfied that the elements of the greater offense are made out. Such jurors, of course, are violating their oath, but such violation is not only consistent with the majority's hypothesis; the majority's hypothesis is bottomed on its occurrence.

For purposes of argument, I accept the plurality's hypothesis; but it seems to me impossible to conclude from it that a mandatory death sentence statute such as North Carolina enacted is any less sound constitutionally than are the systems enacted by Georgia, Florida, and Texas which the Court upholds.

In Georgia juries are entitled to return a sentence of life, rather than death, for no reason whatever, simply

based upon their own subjective notions of what is right and what is wrong. In Florida the judge and jury are required to weigh legislatively enacted aggravating factors against legislatively enacted mitigating factors, and then base their choice between life or death on an estimate of the result of that weighing. Substantial discretion exists here, too, though it is somewhat more canalized than it is in Georgia. Why these types of discretion are regarded by the plurality as constitutionally permissible, while that which may occur in the North Carolina system is not, is not readily apparent. The freakish and arbitrary nature of the death penalty described in the separate concurring opinions of JUSTICES STEWART and WHITE in *Furman* arose not from the perception that so *many* capital sentences were being imposed but from the perception that so *few* were being imposed. To conclude that the North Carolina system is bad because juror nullification may permit jury discretion while concluding that the Georgia and Florida systems are sound because they *require* this same discretion, is, as the plurality opinion demonstrates, inexplicable.

The Texas system much more closely approximates the mandatory North Carolina system which is struck down today. The jury is required to answer three statutory questions. If the questions are unanimously answered in the affirmative, the death penalty *must* be imposed. It is extremely difficult to see how this system can be any less subject to the infirmities caused by juror nullification which the plurality concludes are fatal to North Carolina's statute. JUSTICES STEWART, POWELL, and STEVENS apparently think they can sidestep this inconsistency because of their belief that one of the three questions will permit consideration of mitigating factors justifying imposition of a life sentence. It is, however, as those Justices recognize, *Jurek* v. *Texas, ante*, at 272–

273, far from clear that the statute is to be read in such a fashion. In any event, while the imposition of such unlimited consideration of mitigating factors may conform to the plurality's novel constitutional doctrine that "[a] jury must be allowed to consider on the basis of all relevant evidence not only why a death sentence should be imposed, but also why it should not be imposed," *ante,* at 271, the resulting system seems as likely as any to produce the unbridled discretion which was condemned by the separate opinions in *Furman.*

The plurality seems to believe, see *ante,* at 303, that provision for appellate review will afford a check upon the instances of juror arbitrariness in a discretionary system. But it is not at all apparent that appellate review of death sentences, through a process of comparing the facts of one case in which a death sentence was imposed with the facts of another in which such a sentence was imposed, will afford any meaningful protection against whatever arbitrariness results from jury discretion. All that such review of death sentences can provide is a comparison of fact situations which must in their nature be highly particularized if not unique, and the only relief which it can afford is to single out the occasional death sentence which in the view of the reviewing court does not conform to the standards established by the legislature.

It is established, of course, that there is no right to appellate review of a criminal sentence. *McKane* v. *Durston,* 153 U. S. 684 (1894). That question is not at issue here, since North Carolina, along with the other four States whose systems the petitioners are challenging in these cases, provides appellate review for a death sentence imposed in one of its trial courts.

By definition, of course, there can be no separate appellate review of the factual basis for the sentencing decision

in a mandatory system. If it is once established in a fairly conducted trial that the defendant has in fact committed the crime in question, the only question as to the sentence which can be raised on appeal is whether a legislative determination that such a crime should be punished by death violates the Cruel and Unusual Punishments Clause of the Eighth Amendment. Here both petitioners were convicted of first-degree murder, and there is no serious question raised by the plurality that death is not a constitutionally permissible penalty for such a crime.

But the plurality sees another role for appellate review in its description of the reasons why the Georgia, Texas, and Florida systems are upheld, and the North Carolina system struck down. And it is doubtless true that Georgia in particular has made a substantial effort to respond to the concerns expressed in *Furman,* not an easy task considering the glossolalial manner in which those concerns were expressed. The Georgia Supreme Court has indicated that the Georgia death penalty statute requires it to review death sentences imposed by juries on the basis of rough "proportionality." It has announced that it will not sustain, at least at the present time, death penalties imposed for armed robbery because that penalty is so seldom imposed by juries for that offense. It has also indicated that it will not sustain death penalties imposed for rape in certain fact situations, because the death penalty has been so seldom imposed on facts similar to those situations.

But while the Georgia response may be an admirable one as a matter of policy, it has imperfections, if a failure to conform completely to the dictates of the separate opinions in *Furman* be deemed imperfections, which the opinion of JUSTICES STEWART, POWELL, and STEVENS does not point out. Although there may be some disagree-

ment between that opinion, and the opinion of my Brother WHITE in *Gregg* v. *Georgia,* which I have joined, as to whether the proportionality review conducted by the Supreme Court of Georgia is based solely upon capital sentences imposed, or upon all sentences imposed in cases where a capital sentence could have been imposed by law, I shall assume for the purposes of this discussion that the system contemplates the latter. But this is still far from a guarantee of any equality in sentencing, and is likewise no guarantee against juror nullification. Under the Georgia system, the jury is free to recommend life imprisonment, as opposed to death, for no stated reason whatever. The Georgia Supreme Court cannot know, therefore, when it is reviewing jury sentences for life in capital cases, whether the jurors found aggravating circumstances present, but nonetheless decided to recommend mercy, or instead found no aggravating circumstances at all and opted for mercy. So the "proportionality" type of review, while it would perhaps achieve its objective if there were no possible factual lacunae in the jury verdicts, will not achieve its objective because there are necessarily such lacunae.

Identical defects seem inherent in the systems of appellate review provided in Texas and Florida, for neither requires the sentencing authority which concludes that a death penalty is inappropriate to state what mitigating factors were found to be present or whether certain aggravating factors urged by the prosecutor were actually found to be lacking. Without such detailed factual findings JUSTICES STEWART, POWELL, and STEVENS' praise of appellate review as a cure for the constitutional infirmities which they identify seems to me somewhat forced.

Appellate review affords no correction whatever with respect to those fortunate few who are the beneficiaries

of random discretion exercised by juries, whether under an admittedly discretionary system or under a purportedly mandatory system. It may make corrections at one end of the spectrum, but cannot at the other. It is even less clear that any provision of the Constitution can be read to require such appellate review. If the States wish to undertake such an effort, they are undoubtedly free to do so, but surely it is not required by the United States Constitution.

The plurality's insistence on "standards" to "guide the jury in its inevitable exercise of the power to determine which . . . murderers shall live and which shall die" is squarely contrary to the Court's opinion in *McGautha* v. *California,* 402 U. S. 183 (1971), written by Mr. Justice Harlan and subscribed to by five other Members of the Court only five years ago. So is the plurality's latter-day recognition, some four years after the decision of the case, that *Furman* requires "objective standards to guide, regularize, and make rationally reviewable the process for imposing a sentence of death." Its abandonment of *stare decisis* in this repudiation of *McGautha* is a far lesser mistake than its substitution of a superficial and contrived constitutional doctrine for the genuine wisdom contained in *McGautha.* There the Court addressed the "standardless discretion" contention in this language:

> "In our view, such force as this argument has derives largely from its generality. Those who have come to grips with the hard task of actually attempting to draft means for channeling capital sentencing discretion have confirmed the lesson taught by the history recounted above. To identify before the fact those characterstics of criminal homicides and their perpetrators which call for the death penalty, and to express these characteristics in language

320 which can be fairly understood and applied by the sentencing authority, appear to be tasks which are beyond present human ability.

"Thus the British Home Office, which before the recent abolition of capital punishment in that country had the responsibility for selecting the cases from England and Wales which should receive the benefit of the Royal Prerogative of Mercy, observed:

" 'The difficulty of defining by any statutory provision the types of murder which ought or ought not to be punished by death may be illustrated by reference to the many diverse considerations to which the Home Secretary has regard in deciding whether to recommend clemency. No simple formula can take account of the innumerable degrees of culpability, and no formula which fails to do so can claim to be just or satisfy public opinion.' 1–2 Royal Commission on Capital Punishment, Minutes of Evidence 13 (1949)." 402 U. S., at 204–205.

.    .    .    .    .

"In light of history, experience, and the present limitations of human knowledge, we find it quite impossible to say that committing to the untrammeled discretion of the jury the power to pronounce life or death in capital cases is offensive to anything in the Constitution. The States are entitled to assume that jurors confronted with the truly awesome responsibility of decreeing death for a fellow human will act with due regard for the consequences of their decision and will consider a variety of factors, many of which will have been suggested by the evidence or by the arguments of defense counsel. For a court to attempt to catalog the appropriate factors in this elusive area could inhibit rather than expand the scope of consideration, for no list of cir-

cumstances would ever be really complete. The infinite variety of cases and facets to each case would make general standards either meaningless 'boilerplate' or a statement of the obvious that no jury would need." *Id.,* at 207–208 (citation omitted).

It is also worth noting that the plurality opinion repudiates not only the view expressed by the Court in *McGautha,* but also, as noted in *McGautha,* the view which had been adhered to by every other American jurisdiction which had considered the question. See *id.,* at 196 n. 8.

## IV

The plurality opinion's insistence, in Part III–C, that if the death penalty is to be imposed there must be "particularized consideration of relevant aspects of the character and record of each convicted defendant" is buttressed by neither case authority nor reason. Its principal claim to distinction is that it contradicts important parts of Part III–A in the same opinion.

Part III–A, which describes what it conceives to have been society's turning away from the mandatory imposition of the death penalty, purports to express no opinion as to the constitutionality of a mandatory statute for "an extremely narrow category of homicide, such as murder by a prisoner serving a life sentence." See *ante,* at 287 n. 7. Yet if "particularized consideration" is to be required in every case under the doctrine expressed in Part III–C, such a reservation in Part III–A is disingenuous at best.

None of the cases half-heartedly cited by the plurality in Part III–C comes within a light-year of establishing the proposition that individualized consideration is a constitutional requisite for the imposition of the death penalty. *Pennsylvania ex rel. Sullivan* v. *Ashe,* 302 U. S. 51 (1937), upheld against a claim of violation of

the Equal Protection Clause a Pennsylvania statute which made the sentence imposed upon a convict breaking out of a penitentiary dependent upon the length of the term which he was serving at the time of the break. In support of its conclusion that Pennsylvania had not denied the convict equal protection, the Court observed:

> "The comparative gravity of criminal offenses and whether their consequences are more or less injurious are matters for [the State's] determination. . . . It may inflict a deserved penalty merely to vindicate the law or to deter or to reform the offender or for all of these purposes. For the determination of sentences, justice generally requires consideration of more than the particular acts by which the crime was committed and that there be taken into account the circumstances of the offense together with the character and propensities of the offender. His past may be taken to indicate his present purposes and tendencies and significantly to suggest the period of restraint and the kind of discipline that ought to be imposed upon him." *Id.,* at 55.

These words of Mr. Justice Butler, speaking for the Court in that case, and those of Mr. Justice Black in *Williams* v. *New York,* 337 U. S. 241 (1949), the other opinion relied on by the plurality, lend no support whatever to the principle that the Constitution requires individualized consideration. This is not surprising, since even if such a doctrine had respectable support, which it has not, it is unlikely that either Mr. Justice Butler or Mr. Justice Black would have embraced it.

The plurality also relies upon the indisputable proposition that "death is different" for the result which it reaches in Part III–C. But the respects in which death is "different" from other punishment which may be im-

posed upon convicted criminals do not seem to me to establish the proposition that the Constitution requires individualized sentencing.

One of the principal reasons why death is different is because it is irreversible; an executed defendant cannot be brought back to life. This aspect of the difference between death and other penalties would undoubtedly support statutory provisions for especially careful review of the fairness of the trial, the accuracy of the factfinding process, and the fairness of the sentencing procedure where the death penalty is imposed. But none of those aspects of the death sentence is at issue here. Petitioners were found guilty of the crime of first-degree murder in a trial the constitutional validity of which is unquestioned here. And since the punishment of death is conceded by the plurality not to be a cruel and unusual punishment for such a crime, the irreversible aspect of the death penalty has no connection whatever with any requirement for individualized consideration of the sentence.

The second aspect of the death penalty which makes it "different" from other penalties is the fact that it is indeed an ultimate penalty, which ends a human life rather than simply requiring that a living human being be confined for a given period of time in a penal institution. This aspect of the difference may enter into the decision of whether or not it is a "cruel and unusual" penalty for a given offense. But since in this case the offense was first-degree murder, that particular inquiry need proceed no further.

The plurality's insistence on individualized consideration of the sentencing, therefore, does not depend upon any traditional application of the prohibition against cruel and unusual punishment contained in the Eighth Amendment. The punishment here is concededly not

cruel and unusual, and that determination has traditionally ended judicial inquiry in our cases construing the Cruel and Unusual Punishments Clause. *Trop* v. *Dulles,* 356 U. S. 86 (1958); *Robinson* v. *California,* 370 U. S. 660 (1962); *Louisiana ex rel. Francis* v. *Resweber,* 329 U. S. 459 (1947); *Wilkerson* v. *Utah,* 99 U. S. 130 (1879). What the plurality opinion has actually done is to import into the Due Process Clause of the Fourteenth Amendment what it conceives to be desirable procedural guarantees where the punishment of death, concededly not cruel and unusual for the crime of which the defendant was convicted, is to be imposed. This is squarely contrary to *McGautha,* and unsupported by any other decision of this Court.

I agree with the conclusion of the plurality, and with that of MR. JUSTICE WHITE, that death is not a cruel and unusual punishment for the offense of which these petitioners were convicted. Since no member of the Court suggests that the trial which led to those convictions in any way fell short of the standards mandated by the Constitution, the judgments of conviction should be affirmed. The Fourteenth Amendment, giving the fullest scope to its "majestic generalities," *Fay* v. *New York,* 332 U. S. 261, 282 (1947), is conscripted rather than interpreted when used to permit one but not another system for imposition of the death penalty.