**KWAN FAI MAK, Petitioner,**

v.

**James BLODGETT, Respondent.**

**No. C88–1421WD.**

United States District Court,
W.D. Washington,
at Seattle.

Jan. 8, 1991.

Kathryn Lund Ross, Jones, Ross, Luke, Casteel & Mallory, P.S., Lynnwood, Wash., John B. Midgley, John Midgley, P.S., Seattle, Wash., for petitioner.

William L. Downing, Robert Stephen Lasnik, Seattle, Wash., Linda Anne Dalton, and Paul Douglas Weisser, Atty. Gen.'s Office, Corrections Div., Olympia, Wash., and Theresa Lauren Fricke, Atty. Gen.'s Office, Corrections Div., Seattle, Wash., for respondent.

## MEMORANDUM DECISION AND ORDER ON PETITION FOR WRIT OF HABEAS CORPUS

DWYER, District Judge.

## I.

## INTRODUCTION

This is a petition for a writ of habeas corpus under 28 U.S.C. § 2254 by Kwan Fai Mak, a prisoner sentenced to death in the State of Washington. The respondent is warden of the Washington State Penitentiary at Walla Walla. The case arose from the so-called "Wah Mee Massacre." On the night of February 18–19, 1983, three young men of Chinese extraction entered the Wah Mee Club, an after-hours gambling establishment in Seattle. They tied up and robbed fourteen patrons and employees, then shot them. Thirteen victims died; the other survived and became a trial witness for the state.

The King County Prosecuting Attorney filed an information charging petitioner and co-defendant Benjamin Ng with thirteen counts of aggravated first degree murder and one of first degree assault. The third young man, Tony Ng (not related to Benjamin), was later charged with the same counts after being named by petitioner as the third participant. Tony Ng had disappeared shortly after the crime was committed.

Benjamin Ng was tried first and convicted on all counts. He had fired most of the fatal shots. At the penalty phase mitigating evidence was presented in his behalf. The jury did not agree unanimously that the state had proved beyond a reasonable doubt that there were not sufficient mitigating circumstances to merit leniency. Accordingly, Benjamin Ng was sentenced to life in prison without possibility of parole.

Petitioner was twenty-two years old at the time of the crime. He had come to this country from Hong Kong at age fifteen, as an immigrant with his family. His trial, before a different jury, followed that of Benjamin Ng. Petitioner's trial also ended in a verdict of guilty on all counts. The prosecution argued, and petitioner denied, that he had planned the crime. In the penalty phase virtually no mitigating evidence was presented in his behalf. The jury found that there were not sufficient mitigating circumstances to warrant leniency. On October 1, 1983, petitioner was sentenced to death.

Tony Ng was the last to be tried. He was captured in Calgary, Alberta, in October 1984. Because Canada has no capital punishment, had the prosecutor sought the death penalty, Ng's attorneys and Canadian authorities could have resisted extradition. The prosecutor's decision not to seek the death penalty made possible Tony Ng's return to Seattle. He was convicted on thirteen counts of first degree robbery and one count of second degree assault, and

was sentenced to seven consecutive life terms in prison.

Petitioner appealed his conviction and death sentence to the Washington Supreme Court. In April 1986 that court affirmed by a vote of seven to two. *State v. Mak,* 105 Wash.2d 692, 718 P.2d 407 (1986). A motion for reconsideration was denied four months later. In December 1986 the United States Supreme Court denied certiorari.

In May 1988 the Washington Supreme Court denied petitioner's first personal restraint petition. Five months later the United States Supreme Court denied certiorari as to that ruling.

In November 1988 petitioner filed a petition for a writ of habeas corpus in this court, raising thirty-three claims under the United States Constitution. (Dkt. # # 1, 2). Five days before his scheduled execution this court ordered a stay pending resolution of the claims. (Dkt. # 11). In accordance with the standard practice in this district, the petition was referred to a United States magistrate for a report and recommendation. Magistrate Sweigert found that the petition included a claim as to which petitioner had not exhausted his state court remedies, and recommended dismissal with leave to amend to delete the unexhausted claim. (Dkt. # 56). This procedure was adopted by order dated February 13, 1989. (Dkt. # 61). Petitioner filed an amended petition ten days later. (Dkt. # 63). His personal restraint petition in state court, pursuing the deleted claim, was later denied by the Washington Supreme Court.

To avoid the possibility of repeated habeas corpus petitions, Magistrate Sweigert adopted a procedure designed to bring forth all claims at the same time. He directed petitioner to identify and present all his claims. In response, petitioner filed a declaration identifying all known claims, whether exhausted or not. He was then required to file a supplemental petition presenting every claim that he chose to litigate in federal court. He did so, adding eleven claims. Any claims not included in the supplemental petition were deemed abandoned. (*See* Dkt. # # 108, 120, 124, 134, 150, 151).

The magistrate then considered respondent's motion for summary judgment and petitioner's motion for an evidentiary hearing. On June 29, 1990, he issued his report and recommendation for disposition of all forty-three claims. (Dkt. # 198). Magistrate Sweigert concluded that forty of the claims were without merit, and recommended denial. Two of the remaining claims, numbered 5.34 and 5.1, asserted ineffective assistance of counsel during the guilt and penalty phases of the trial; the third, number 5.7, alleged that petitioner's due process right under *Brady v. Maryland,* 373 U.S. 83, 83 S.Ct. 1194, 10 L.Ed.2d 215 (1963), was violated when the trial judge denied him discovery of some 800 pages from the files of the Seattle Police Department's "Wah Mee Task Force." The magistrate recommended that an evidentiary hearing be held as to the ineffective assistance of counsel claims, and that the court review *in camera* the alleged *Brady* material to determine its materiality to petitioner's defense.

The court adopted a schedule, and later extended it at the parties' request, for objections to the report and recommendation. Objections were filed. On August 30, 1990, the court ordered an evidentiary hearing on the issue of whether the acts and omissions of defense counsel complained of were the result of a reasoned decision by counsel, or of oversight. (Dkt. # 226). On September 11, 1990, the court ordered an *in camera* inspection of the alleged *Brady* materials. (Dkt. # 232).

The evidentiary hearing was held on October 30, 1990. The parties then filed post-hearing briefs. Respondent moved to supplement the record with further declarations of Robert S. Lasnik and William L. Downing, who were the two deputy prosecuting attorneys at petitioner's trial. The court granted the motion and allowed an opportunity for answering declarations. (Dkt. # 320). The record was complete as of December 18, 1990.

This memorandum decision constitutes the court's findings of fact, conclusions of law, and order on the petition for a writ of habeas corpus. For the reasons given, the petition is denied as to petitioner's convic-

tion of aggravated first degree murder, and is granted as to the sentence of death. A new capital sentencing proceeding in state court will be required if the state decides to pursue the death penalty.

## II.

### EVIDENTIARY RULINGS

At the evidentiary hearing of October 30, 1990, live testimony was received from the two lawyers who represented petitioner at his trial, Donald L. Madsen and James A. Robinson. The testimony of the other witnesses was received by deposition. *See* Order Re Evidentiary Hearing (Sept. 11, 1990) (Dkt. # 232); 28 U.S.C. § 2246. Exhibits were offered and admitted at the hearing. A number of objections to deposition testimony were decided after the hearing. *See* Rulings on Objections to Evidence Offered at Evidentiary Hearing Held on October 30, 1990 (Dkt. # 293). Respondent particularly objected to the testimony of two expert witnesses: Richard Cease, the Chief Public Defender in Spokane County, Washington, and Graham Johnson, an expert on the culture of Chinese immigrants to North America. These objections were overruled. The opinions expressed by Mr. Cease have been received only insofar as they bear on the standard of practice among competent practitioners in capital cases; they have not been considered insofar as they speak to whether a deprivation of the right to the effective assistance of counsel occurred. In any event, the ruling on the petition for habeas corpus would be the same if the disputed parts of the Cease and Johnson depositions were excluded.

## III.

### FORTY CLAIMS AS TO WHICH MAGISTRATE HAS RECOMMENDED DENIAL

The filing of objections to a magistrate's report requires the judge to "make a de novo determination of those portions of the report or specified proposed findings or recommendations to which objection is made." 28 U.S.C. § 636(b)(1)(C). That has been done in this case. All claims have been reviewed *de novo*, and all relevant parts of the record, together with the parties' objections and briefs, have been fully considered. The magistrate's report of June 29, 1990, recommends denial of forty claims of alleged constitutional violations at petitioner's trial. (Dkt. # 198). The record confirms that all of these claims are without merit; the magistrate's report as to them is hereby adopted as the order of the court; and the petition as to these forty claims is denied.

## IV.

### THE CLAIM THAT PETITIONER'S RIGHT TO DUE PROCESS OF LAW WAS VIOLATED WHEN THE TRIAL JUDGE DENIED HIM ACCESS TO APPROXIMATELY 800 PAGES OF POLICE STATEMENTS AND REPORTS

Petitioner's claim number 5.7 is that his *Brady* rights were violated when the trial judge denied him access to about 800 pages of documents generated by the "Wah Mee Task Force." *Brady* requires disclosure of evidence that is favorable to the accused and material either to his alleged guilt or his punishment. Where evidence has been specifically requested by the defense, it is material if it "would tend to exculpate ... or to reduce the penalty," or if it "might have affected the outcome of the trial." *United States v. Dupuy*, 760 F.2d 1492, 1501 n. 3 (9th Cir.1985) (citations omitted).

An *in camera* review has now been conducted of the documents that were provided to the defense, and of those that were not. It is clear that the prosecuting attorneys complied fully with their duty under *Brady*. None of the requested material was required to be produced. This claim is therefore denied.

## V.

### THE CLAIM THAT PETITIONER WAS DEPRIVED OF THE EFFECTIVE ASSISTANCE OF COUNSEL, IN VIOLATION OF HIS SIXTH AMENDMENT RIGHT, IN THAT HIS COUNSEL FAILED TO PRESENT EVIDENCE IN MITIGATION AT THE PENALTY PHASE OF HIS TRIAL

#### A. *Constitutional Standards*

The Constitution requires the most careful scrutiny of every case in which a

person has been sentenced to death. In *Johnson v. Mississippi*, 486 U.S. 578, 108 S.Ct. 1981, 1986, 100 L.Ed.2d 575 (1988), the Supreme Court said:

> The fundamental respect for humanity underlying the Eighth Amendment's prohibition against cruel and unusual punishment gives rise to a special " 'need for reliability in the determination that death is the appropriate punishment' " in any capital case. *See Gardner v. Florida*, 430 U.S. 349, 363–364, 97 S.Ct. 1197, 1207–1208, 51 L.Ed.2d 393 (1977) (quoting *Woodson v. North Carolina*, 428 U.S. 280, 305, 96 S.Ct. 2978, 2991–92, 49 L.Ed.2d 944 (1976)) (WHITE, J., concurring in judgment).

■ The sixth amendment guarantees to every defendant the right "to have the Assistance of Counsel for his defence." The due process clause of the fourteenth amendment makes this requirement applicable to the states. *Gideon v. Wainwright*, 372 U.S. 335, 342, 83 S.Ct. 792, 795, 9 L.Ed.2d 799 (1963). The Supreme Court has long recognized that the constitutional right is to "the *effective* assistance of counsel." *McMann v. Richardson*, 397 U.S. 759, 771 n. 14, 90 S.Ct. 1441, 1449 n. 14, 25 L.Ed.2d 763 (1970) (emphasis added). In *Strickland v. Washington*, 466 U.S. 668, 686–87, 104 S.Ct. 2052, 2063–64, 80 L.Ed.2d 674 (1984), the Court held that this guarantee extends to a sentencing proceeding in a capital case:

> A capital sentencing proceeding like the one involved in this case, however, is sufficiently like a trial in its adversarial format and in the existence of standards for decision, see *Barclay v. Florida*, 463 U.S. 939, 952–954 [103 S.Ct. 3418, 3426–3427, 77 L.Ed.2d 1134] (1983); *Bullington v. Missouri*, 451 U.S. 430 [101 S.Ct. 1852, 68 L.Ed.2d 270] (1981), that counsel's role in the proceeding is comparable to counsel's role at trial—to ensure that the adversarial testing process works to produce a just result under the standards governing decision.

The Court in *Strickland* set out the test to be applied:

> A convicted defendant's claim that counsel's assistance was so defective as to require reversal of a conviction or death sentence has two components. First, the defendant must show that counsel's performance was deficient. This requires showing that counsel made errors so serious that counsel was not functioning as the "counsel" guaranteed the defendant by the Sixth Amendment. Second, the defendant must show that the deficient performance prejudiced the defense. This requires showing that counsel's errors were so serious as to deprive the defendant of a fair trial, a trial whose result is reliable. Unless a defendant makes both showings, it cannot be said that the conviction or death sentence resulted from a breakdown in the adversary process that renders the result unreliable.

*Id.* at 687, 104 S.Ct. at 2064.

The *Strickland* test has been applied in court of appeals cases in this circuit dealing with defense counsel's failure to present mitigating evidence. In *Campbell v. Kincheloe*, 829 F.2d 1453, 1462 (9th Cir.1987), *cert. denied*, 488 U.S. 948, 109 S.Ct. 380, 102 L.Ed.2d 369 (1988), the court rejected a claim of ineffective assistance of counsel through a failure to present such evidence on the ground that defense counsel had made a reasoned strategic choice:

> The record amply supports the district court's finding that the decision of Campbell's counsel not to present mitigating evidence at the sentencing proceeding was a reasoned strategic choice falling well within "the wide range of professionally competent assistance." [citing *Strickland*, 466 U.S. at 690, 104 S.Ct. at 2066].

> \* \* \* \* \* \*

> Faced with the choice of limiting the state to a relatively tame presentation of Campbell's prior convictions, or potentially opening the door to devastating rebuttal evidence, Campbell's counsel chose the former route by electing not to present mitigating evidence.

In *Deutscher v. Whitley*, 884 F.2d 1152, 1159 (9th Cir.1989), the Ninth Circuit

reached the opposite result, and ordered a writ of habeas corpus granted, where counsel's failure to present mitigating evidence at a capital sentencing hearing reflected simply a failure to perform:

> We agree with the district court that Deutscher's counsel's performance was defective. Counsel's sole mitigating argument was that Deutscher must have had some sort of mental problem. Yet counsel did not even consider presenting evidence of Deutscher's mental problems or any other mitigating evidence at the penalty phase hearing. Counsel himself admitted at the state trial court hearing on this issue that this aspect of Deutscher's representation was deficient. Counsel made no tactical decision not to investigate Deutscher's possible mental impairment. He simply failed to do so.

The *Deutscher* court further found that the mitigating evidence could have made a difference:

> To show that prejudice resulted from his counsel's defective performance, Deutscher must show that "there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *Strickland,* 466 U.S. at 694, 104 S.Ct. at 2068. "A reasonable probability is a probability sufficient to undermine confidence in the outcome." *Id.* We cannot say with confidence that the jury's sentencing decision would have been the same in this case had Deutscher's counsel presented the available mitigating evidence.

*Id.* at 1160.

The questions in the present case are whether defense counsel failed to present mitigating evidence at petitioner's sentencing hearing; whether, if so, the failure was such that petitioner was deprived of the effective assistance of counsel; and whether, if so, the failure was so serious as to deprive petitioner of a fair trial.

### B. *The Failure to Present Mitigating Evidence*

In Washington a person convicted of aggravated first degree murder is sentenced either to life imprisonment without possibility of release or parole, or to be put to death. RCW 10.95.030(1). If the prosecuting attorney has given advance notice that the death penalty will be sought, and the person is convicted, a special sentencing proceeding is then held. RCW 10.95.050. This proceeding "shall commence as soon as practicable after completion of the trial at which the defendant's guilt was determined." RCW 10.95.050(3). Both parties may present evidence and argument at the sentencing hearing. RCW 10.95.060(2). The court instructs the jury, and the jury then retires to deliberate upon the following question:

> Having in mind the crime of which the defendant has been found guilty, are you convinced beyond a reasonable doubt that there are not sufficient mitigating circumstances to merit leniency?

RCW 10.95.060(4). In order to answer "yes," the jury must be unanimous. *Id.* If the jury does answer "yes," the sentence "shall be death." RCW 10.95.030(2). If one or more jurors are not convinced of the absence of sufficient mitigating circumstances, the sentence is life imprisonment without parole.

██ Decisional law has defined the scope of evidence that may be presented at the special sentencing proceeding. The state may present, in its case in chief, evidence of the defendant's criminal record and relevant evidence which would have been admissible in the guilt phase. *State v. Bartholomew,* 98 Wash.2d 173, 654 P.2d 1170 (1982), *vacated and remanded for reconsideration,* 463 U.S. 1203, 103 S.Ct. 3530, 77 L.Ed.2d 1383 (1983), *reaffirmed,* 101 Wash.2d 631, 683 P.2d 1079 (1984). The defendant may then present evidence in mitigation. If he does so, the state in rebuttal may present evidence only if it is relevant to a matter raised in mitigation by the defendant, and only if its rebuttal value outweighs its prejudicial effect. *Id.*

██ Petitioner was represented at his trial by Donald L. Madsen and James A. Robinson. At the time both lawyers were employed by Associated Counsel for the Accused ("ACA"), a public defense agency

in Seattle. The case against petitioner and co-defendant Benjamin Ng was commenced in February 1983, but Messrs. Madsen and Robinson were not appointed until late May, 1983, when petitioner's original counsel withdrew.

The first phase of counsel's work was devoted largely to trying to get a continuance of the trial which had been scheduled for August 1983. After reviewing the initial discovery they moved for a continuance, stating: "There is no way in the world we can be prepared to try this case before October 1, 1983." 22 REC 7831. Their efforts to gain more preparation time are reflected at 22 REC 7831, 7849, 7875, 7883, 7904, 7917, 7958, and 7981. The trial commenced September 12, 1983, three and a half months after trial counsel were appointed.

Neither Mr. Madsen nor Mr. Robinson had any capital trial experience at the time. Each had tried only one murder case. Mr. Madsen had been out of law school about four years, and Mr. Robinson just over three years, and both had begun work at ACA soon after being admitted to the bar.

The "Wah Mee Massacre" case was the subject of intense pretrial and trial publicity, and was complicated by barriers of language and culture.

Defense counsel worked hard and conscientiously on the case, devoting many hours to it every week. However, they concentrated almost exclusively on the guilt phase. Their effort was to show that petitioner had not intended that any murders be committed, and that the others were more responsible than he.

The effort did not succeed. Petitioner was found guilty on all counts.

The penalty phase of the trial—the special sentencing proceeding—began only a few hours after the verdict of guilty was returned. The prosecution presented no evidence. Petitioner at the time was twenty-two years old, and had come to this country as a fifteen-year-old immigrant from Hong Kong. The defense nevertheless presented no evidence regarding him, his background or family relationships, or the cultural differences and dislocations which arguably affected his conduct. The only evidence presented by defense counsel was the testimony of an expert on eyewitness identification (in an attempt to cast doubt on the testimony of a prosecution witness who testified in the guilt phase), and the penalty phase verdict of co-defendant Benjamin Ng, who had received a life sentence following his conviction on thirteen identical counts of aggravated first degree murder. Defense counsel had planned to present evidence regarding the involvement of one Hing Wong in planning the crime with Benjamin Ng, in hopes of rebutting the state's claim that petitioner was the planner, but the trial court ruled this evidence inadmissible.

There was substantial and important mitigating evidence readily available. The testimony of family members and others could have been offered to show that petitioner was the beloved youngest son of a traditional Chinese family; that he had been a good student and dutiful son in Hong Kong; that after coming to this country he did well in citizenship, and in some school subjects, for the first few years; that he worked and gave money to the family; that he helped his parents in other ways; that he was kind to other members of the extended family; and that he was a "favorite uncle" to young nieces and nephews. These relatives did not know that they could attend the trial and testify. The following evidence produced at the recent hearing, which was also available at the time of his trial, is illustrative:

Yen Sau Mak and Wan Hoi Wong are petitioner's immigrant parents. Their joint declaration, as translated, is phrased partly in the third person, but represents their testimony on direct examination. The declaration reads in part as follows:

Kwan Fai Mak was born in Hong Kong, the youngest of three children. The family was poor, but the parents worked hard. The family lived in the densely populated, relatively impoverished, Kowloon section of Hong Kong.

Kwan Fai was a good son and was a good student in Hong Kong. He never presented any disciplinary problem for

the parents. Kwan Fai and his parents were always close.

When Kwan Fai reached the age of eleven or so, he started working part time, in addition to continuing with school, and contributed money and food to the family unit.

The family moved to Seattle in 1976 because the parents believed the opportunities and standards of living would be better for their two sons and grandchildren in America. Kwan Fai's older sister had migrated to Seattle nine years earlier and the entire Mak family moved in with daughter, Karen Kwan, her husband and children upon arrival in Seattle.

There were radical differences in culture, conditions, and life style between Hong Kong and Seattle.

Kwan Fai was fifteen years old when the family immigrated. He enrolled at Sharples Jr. High in Seattle. Although he spoke little English, Kwan Fai was a good student at Sharples and received grades of "A" in science and math.

Kwan Fai continued to be devoted to his parents. When he could speak English sufficiently, he helped his father with daily transactions at the bank and government offices and often ran errands for his mother. When he could drive, he chauffered [sic] his dad whenever requested because his father did not drive, although Mr. Mak had obtained a driver's license. Mrs. Mak becomes ill when riding in a car and Kwan Fai would routinely do grocery shopping his mother [sic].

Parents of Kwan Fai Mak have proudly preserved his school certificates dating back to his primary years in Hong Kong and including awards for perfect attendance, service and citizenship, academic honor roll, and certificate of promotion from Sharples Jr. High. See attached.

\*   \*   \*   \*   \*   \*

At Cleveland High School, Kwan Fai's grades declined. For reasons unknown to his parents, Kwan Fai dropped out of school at the beginning of the eleventh grade. He found employment and continued to be a good son and contributing member of the household. When Kwan Fai was working, he brought occasional gifts to his mother saying she should have some of these American conveniences. Kwan Fai often gave his parents money.

The older son, his wife, and three small children, also lived in the parents household. Kwan Fai was good with the kids, playing with them and buying them gifts.

Mr. and Mrs. Mak never observed anything about their son that indicated a violent disposition. To the contrary, in his relationships within the family, Kwan Fai was good natured and generous.

Mr. and Mrs. Mak had no knowledge of any criminal activities on the part of Kwan Fai. Some time during the year prior to his arrest, Kwan Fai started spending a great deal of time in Chinatown, which was a change of behavior. Kwan Fai did not introduce many of his friends to his parents. They do not believe they ever met Benjamin Ng.

Deposition of Graham Edwin Johnson, Exh. 2 (Hearing Exh. 12). Petitioner's mother, Wan Hoi Wong, was cross-examined through an interpreter at her deposition. She testified under questioning by respondent's counsel:

Q. Mrs. Mak, do you know if someone from your son's lawyer [sic] talked to the rest of your family about you coming to testify?

A. No, I was never asked. If I was asked, I certainly would go. I didn't know. If they had asked, I would go with my husband, for sure, as a couple. Like, we would have gone as a couple. If I had to roll on the floor to go, I would roll on the floor to go.

Deposition of Wan Hoi Wong at 21 (Hearing Exh. 5).

Petitioner's father, Yen Sau Mak, under questioning by respondent's counsel, testified through an interpreter:

Q. You still believe that your son is innocent of these crimes, don't you?

A. I trust my son. I do not think he has done something like this, and he is so filial to us all of these years.

Q. What does filial mean?

A. Filial, meaning he is very obedient. He is very respectful of us. He is buying a lot of things home [sic]. He is treating the family members very well. Like when he has the money to buy something, he, himself, doesn't get it, and he will save those for his parents.

Q. Is it your position that Kwan Fai always told you the truth?

A. He never lied to me. Everything he told me is the truth.

Deposition of Yen Sau Mak at 21–22 (Hearing Exh. 4).

Photographs of petitioner as a child and young man, showing him with family members and schoolmates, were also available. These photographs suggest wholesome and friendly relationships. Deposition of Wan Hoi Wong, Exhs. 2A–2H (Hearing Exh. 5).

School records from Hong Kong and Seattle were also available as exhibits. These show that petitioner successfully completed the six-year primary course in Hong Kong, including a satisfactory grade for conduct; that he received commendations at Sharples Jr. High School in Seattle for service and citizenship and for regular attendance; that notwithstanding initial language difficulties, he achieved honor roll grades at Sharples; and that he showed ability in science and mathematics, including some "A" grades, in junior and senior high school. Deposition of Wan Hoi Wong, Exhs. 4 and 5A–5E (Hearing Exh. 1).

Johnny Kwan, a nephew of petitioner although only two years younger, was a student at the University of Washington at the time of the crime. He is now employed at a research laboratory and has nearly completed the work for a zoology degree at the University. He states in his declaration:

I am a nephew of Kwan Fai Mak. My mother is Karen Kwan, Kwan Fai's older sister. My brother is Sonny Kwan.

I am just two years younger than Kwan Fai.

I was never interviewed by Kwan Fai's trial lawyers, although I may have met John Wolfe. I don't believe I met the trial lawyers until after Kwan Fai was sentenced to death. At that time they came to the house (my grandparents had moved back in with us after Kwan Fai was arrested) and talked about the appeal.

I recall my grandparents were very confused when the first attorney that they had hired for Kwan Fai, John Wolfe, quit the case. They had no money to hire another lawyer and they did not understand the public defender system. My grandparents thought that Kwan Fai was being treated differently because they were poor. My grandparents still do not speak English.

I was about five years old when my parents brought me to live in Seattle. I remember playing with Kwan Fai when I was a little toddler, but don't have alot [sic] of memory of those early childhood years in Hong Kong.

When Kwan Fai's family moved to Seattle, Kwan Fai, Sonny and I developed good relationships with each other. Kwan Fai did not speak English when he moved to Seattle and this made it difficult for him to make friends with other kids at Sharples. However, Kwan Fai did well in school.

I always liked Kwan Fai. He was a quiet person. He had a mellow personality. When Kwan Fai got older and wasn't in school he would sometimes take me and Sonny to dinner.

As I got older, I got very involved in my high school activities and studying. I saw Kwan Fai less because of my own schedule. However, I still saw Kwan Fai at holidays and he continued to be friendly and good to be around. I don't recall anything out of the ordinary whenever I did see Kwan Fai.

My observation was that Kwan Fai was a good family member. It is common in Chinese families for the youngest son to be a favorite and that appeared to be the case with Kwan Fai's parents. They loved Kwan Fai very much. There was a very close parent-son relationship between Kwan Fai and his parents. I know my grandparents, Kwan Fai's parents, wanted to help him and would have testified had they known they could help

Kwan Fai. Myself and other family members also would have testified had we been asked and made aware that our information could help save Kwan Fai's life.

Deposition of Johnny Kwan, Exh. 1 (Hearing Exh. 10).

On cross-examination by respondent's counsel, Johnny Kwan testified:

Q. Did you go to the trial?

A. No.

Q. Why didn't you go?

A. I didn't know when it was.

Q. You didn't what?

A. I didn't know when it was.

Q. Okay. Do you know if anybody else in your family knew when it was?

A. I don't believe so.

Deposition of Johnny Kwan at 17 (Hearing Exh. 10).

Yau Lin Mak, petitioner's sister-in-law, testified:

I was never interviewed by Kwan Fai Maks [sic] trial lawyers.

My husband and I have lived with his parents since we came to this country from Hong Kong. During most of our first two years in Seattle, Kwan Fai Mak also lived with us, although he lived separately for a few periods of time. I observed that Kwan Fai was a good person in the family, that he was good to his parents and considerate of the other people in the family. He was a kind uncle to our children and played with them affectionately. I never knew Kwan Fai to be violent—that was not his nature around the family.

Deposition of Yau Lin Mak, Exh. 1 (Hearing Exh. 8).

On cross-examination, Yau Lin Mak testified:

Q. Do you recall what year you came to Seattle?

A. 1980.

Q. How often would you see Kwan Fai at the home?

A. I saw him all of the time. Like, when I first got here, I did not know how to drive, and he was who took me to work and took we [sic] back home. A lot of times he took my kids out to play. He's a good guy.

Q. Did he bring any of his friends around you?

A. No.

Q. Did you see him down in China Town?

A. Well, sometimes in the weekend he took me out to China Town to have lunches.

Q. Did you know that he was involved with criminal activity?

A. No.

Deposition of Yau Lin Mak at 5 (Hearing Exh. 8).

It was also open to defense counsel at the trial to present expert testimony on the culture of the Hong Kong Chinese, and on the adjustment difficulties experienced by many of them in North America. Evidence of this type was presented at the recent hearing through the deposition of Professor Graham E. Johnson, an anthropologist and sociologist at the University of British Columbia, who lived for several years in Hong Kong, speaks the language, and has excellent qualifications as an expert. Dr. Johnson had interviewed members of the Mak family. His testimony, if accepted, would show serious assimilation problems experienced by many Chinese who are moved during adolescence from Hong Kong to North America, and certain values in the Chinese culture of Hong Kong which could help to explain petitioner's involvement in criminal activities here. It would also suggest that petitioner's apparent lack of emotion at trial did not necessarily indicate disinterest or coldness, but was consistent with cultural expectations of Chinese males. *See* Deposition of Graham Edwin Johnson (Hearing Exh. 12).

The foregoing if taken as a whole would have been potentially powerful evidence in mitigation. None of it was presented.

### C. *The Reason for Failing to Present Mitigating Evidence*

In a capital case in Washington, once the accused has been found guilty, the sentencing proceeding that follows amounts to a

separate trial. The issue for the jury is whether the defendant will live or die. The proof may go far beyond the crime in question. The defendant is entitled to present evidence of his background and life experiences. Whatever good traits he may have, whatever he has done that is praiseworthy, the fact that he is cherished by family or friends, can all be placed in evidence. The sentencing hearing is defense counsel's chance to show the jury that the defendant, despite the crime, is worth saving as a human being. On the jury's assessment of this, the decision of life or death may depend. To fail to present important mitigating evidence in the penalty phase—if there is no risk in doing so—can be as devastating as a failure to present proof of innocence in the guilt phase.

In the present case it is clear that counsel failed to present the available mitigation evidence solely through oversight. There was no risk in presenting it. There was no decision on their part to leave it out. In the pressure and hurry of the moment, they simply did not think of using this type of evidence.

Mr. Madsen testified at the October 30 hearing, in response to questions by the court:

> Q. Did you know or did you believe, at the time of this trial, that showing the jury the defendant's human qualities, his family attachments, the fact that he was loved, if he was, by members of his family, could be important?
>
> A. I don't believe that we had considered that fully, how important, potentially, that evidence was.
>
> Q. Did you make any conscious decision about that kind of evidence one way or the other?
>
> A. I don't believe we did.
>
> Q. Can you explain why not?
>
> A. Looking back on it, I don't understand why we did not. I think that type of information could be extremely important. We did not choose to do that. We did not elicit that type of information from his family.
>
> Q. Was there anything about that kind of information, if offered in evidence, that you feared could open up something disadvantageous to the defendant?
>
> A. I don't believe that type of information could have opened up something that was to the detriment of the defense.

Transcript of Proceedings at 44 (Oct. 30, 1990) (Dkt. # 297).

Mr. Robinson's testimony is similar. *See id.* at 90–92.

The testimony of the deputy prosecutors who tried the case (both of whom are now King County Superior Court judges) confirms that, under the restrictions imposed on the state's rebuttal by the *Bartholomew* case, *supra*, there was no risk to the defense in presenting mitigating evidence from the family, school records, and similar sources. *See* Deposition of Robert S. Lasnik (Hearing Exh. 22); Deposition of William L. Downing (Hearing Exh. 21).

Both defense lawyers have testified that if they had gathered evidence of this type and understood its value they would have presented it. The proof would not be incompatible with anything else they planned to offer. The defense lawyers had talked to petitioner's parents, but through petitioner's brother rather than through a trained interpreter. One lawyer had formed the opinion that the mother should not be asked to make a plea for mercy, but he could not remember why, and both counsel testified that they failed to seek mitigating *evidence* from the parents or anyone else. Transcript of Proceedings at 15, 27, 31, 59, 60, 72, 77 (Oct. 30, 1990) (Dkt. # 297).

During the guilt phase counsel had presented some evidence on local Chinese culture through lay witnesses, but in the main had found this unsatisfactory. *Id.* at 15, 45–46. They did not seek to obtain an expert, although there was no disadvantage in doing so. They presented no evidence as to Chinese culture and assimilation difficulties in the penalty phase. A Seattle lawyer experienced in capital cases, Timothy K. Ford, who was not counsel in this case, tried repeatedly to suggest that petitioner's Hong Kong background be explored. Declaration of Timothy K. Ford at

2–3 (Hearing Exh. 14). These suggestions were not heeded.

In the words of the Ninth Circuit, defense counsel "made no tactical decision" not to put on mitigating evidence; they "simply failed to do so." *Deutscher, supra,* 884 F.2d at 1159.

To make this finding is by no means to imply that Messrs. Madsen and Robinson were lacking in zeal, devotion to their client's cause, or skill in seeking his acquittal. These lawyers undertook a thankless and difficult job and bent every effort to handle it well. The problem was that in concentrating on the guilt phase of the case they completely overlooked the importance of gathering and presenting, at the penalty phase, evidence favorable to their client as a person. When the jury's verdict as to guilt came in, they were caught without resources that they should have had. As shown by the testimony of the deputy prosecutor, the defense lawyers made an informal request, off the record, for additional time to prepare for the penalty phase. Declaration of William L. Downing (Nov. 14, 1990) (Dkt. # 306). They failed to make or argue a motion, or do anything else on the record, for that purpose. Their informal request was denied and the penalty phase went forward a few hours later. They were unprepared for it. Their failure to gather and present mitigating evidence was not in any way calculated or purposeful, nor were counsel lacking in devotion to their client's cause. The failure was the result, rather, of a combination of their inexperience, the short time available to them to get ready to prepare for trial after their belated appointment, the cultural and linguistic barriers they failed to surmount, the press of events, and their single-minded concentration on the guilt phase. These reasons are understandable, but the failure to present important and readily available mitigating evidence, where no risk would have been incurred, must be held to be a deprivation of the right to the effective assistance of counsel.

### D. *Prejudicial Effect*

■ To show the required prejudice, the petitioner must show a reasonable probability that, but for counsel's errors, the result of the proceeding would have been different. *Deutscher,* 884 F.2d at 1160 (*citing Strickland,* 466 U.S. at 694, 104 S.Ct. at 2068). A reasonable probability is one "sufficient to undermine confidence in the outcome." *Id.*

Under Washington law it was the state's burden to convince *every one* of the twelve jurors, beyond a reasonable doubt, that there were no "sufficient mitigating circumstances" to merit life imprisonment without parole rather than death. RCW 10.95.060(4). In arguing for the death penalty, the deputy prosecutor relied upon the absence of any proof of positive human qualities in petitioner. He told the jury:

> What separates Willie Mak from the others, is the same thing that distinguishes him from all other murderers, the premeditation of this crime, *the total absence of fundamental values. There's nothing here to lessen moral culpability.*

Petitioner's Post–Hearing Brief at 5 (quoting 11 REC 4170–4171) (emphasis added) (Nov. 14, 1990) (Dkt. # 302).

The jury appears to have accepted this argument. Benjamin Ng, tried earlier by a different jury, was the subject of evidence in mitigation, including the testimony of his mother. Petitioner did not have the benefit of such evidence, although it was available. It is impossible to know with certainty whether the mitigating evidence would have changed the outcome, but it very well might have—especially since the death penalty could not be imposed if even one juror was not convinced beyond a reasonable doubt that it should be. There is thus a reasonable probability that, but for the deprivation of counsel's effective assistance at the penalty phase, the result would have been different. A person cannot constitutionally be put to death under such circumstances. The petition for a writ of habeas corpus must be granted as to the sentence of death.

## VI.

## REMAINING CLAIMS

The other claims as to which the magistrate did not recommend a final disposition

are petitioner's claims that he was deprived of effective assistance when his trial counsel failed to seek or object to certain jury instructions, failed to object to certain instructions, and failed to seek precautionary measures to minimize the effects of pretrial publicity. *See* Magistrate's Report and Recommendation at 4–6, 42 (claims 5.1 and 5.34) (June 29, 1990) (Dkt. # 198). These claims, as amplified in regard to both the guilt and penalty phases of the trial following issuance of the magistrate's report, have been fully considered under the applicable sixth amendment standards. Defense counsel's work in the respects challenged fell within the "wide range of professionally competent assistance" contemplated by *Strickland.* These claims are therefore denied.

## VII.

### CONCLUSION AND ORDER

For the reasons stated, petitioner's conviction on all counts of aggravated first degree murder is constitutionally valid. The petition for a writ of habeas corpus is denied insofar as it seeks a new trial as to guilt or innocence. Petitioner was deprived of his sixth amendment right to the effective assistance of counsel when his trial attorneys failed to present readily available mitigating evidence at his sentencing hearing. The error was prejudicial to petitioner within the meaning of *Strickland v. Washington,* 466 U.S. 668, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984). The petition is therefore granted as to the sentence of death, and the sentence is vacated. A new sentencing proceeding under the provisions of RCW 10.95.050 may be held, or the state may elect to waive the death penalty, in which event petitioner will be sentenced to life in prison without possibility of release. *See* RCW 10.95.030(1).