**UNITED STATES of America, Plaintiff,**

v.

**Gary Joe LITTRELL, Defendant.**

**No. CR 02–938–CJC–22.**

United States District Court, C.D. California, Southern Division.

March 22, 2007.

Stephen G. Wolfe, Assistant United States Attorney, Los Angeles, CA, for Plaintiff.

Christopher C. Chaney, Pasadena, CA, David J.P. Kaloyanides, Los Angeles, CA, for Defendants.

## ORDER STRIKING THE GOVERNMENT'S NOTICE OF INTENTION TO SEEK THE DEATH PENALTY

CARNEY, District Judge.

Defendant Gary Joe Littrell moves to strike the Government's notice of intention to continue to seek the death penalty against him as unconstitutional. Mr. Littrell's motion is GRANTED. The Government violates a defendant's right to due process under the Fifth Amendment to the United States Constitution when its decision to seek the death penalty is arbitrary and capricious.

## I. FACTUAL BACKGROUND[1]

Mr. Littrell is one of forty defendants charged in what is believed to be the larg-

---

1. All facts are construed in the light most favorable to the Government. Unless other-

est capital murder indictment in American history. The target of this indictment is the Aryan Brotherhood prison gang. Originally founded in San Quentin Penitentiary in the 1960s, the Aryan Brotherhood has evolved into one of the most dangerous, violent gangs in both the federal and state penal systems. The gang and its members live by the "blood in, blood out" motto. To gain membership in the Aryan Brotherhood, an inmate generally must kill on behalf of the Aryan Brotherhood. Having entered the gang by blood, that person is a member of the Aryan Brotherhood until death.

As suggested by its name, the Aryan Brotherhood is a race-based, all-white gang. Initially, the members grouped together for protection from other race-based gangs in the prison system, such as the Black Guerilla Family, the Mexican Mafia, and Nuestra Familia. The Aryan Brotherhood has been responsible for promoting "race wars"—organized violence against black inmates at federal penitentiaries in Marion, Illinois and Lewisburg, Pennsylvania. After the penitentiary in Marion had been plagued with weeks of racial violence, five Aryan Brotherhood members responded with a coordinated attack on members of the DC Blacks (another race-based prison gang) in Lewisburg. The attacks resulted in the death of two black inmates. One was stabbed thirty-seven times, the other thirty-five. Wayne Bridgewater, one of the attackers and a defendant in this case, emerged from the cell of his victim, Frank Joyner, covered in blood. These assaults were conducted in full view of guards, security cameras, and other inmates.

As the Aryan Brotherhood has evolved, it has shifted its focus from racial violence to exerting power and control over the prisons and running as a full-fledged organized criminal enterprise.[2] In order to facilitate the transition into an organized criminal enterprise, the Aryan Brotherhood established a formal hierarchy among its membership to control the operations of the gang. In the early 1980s, several of the Aryan Brotherhood's most influential members were assembled for an organizational meeting.[3] The group adopted a structure similar to that of the Italian Mafia. At the federal level, a three-man Federal Commission was formed to oversee activity in the federal prisons. A Federal Council, subordinate to the Commission, was subsequently created to handle the day-to-day affairs of the gang. Similarly, the California contingent of the Aryan Brotherhood formed a Council to govern affairs within California, with a three-man California Commission to oversee the Council. The Commissions have final authority over all matters within their respective systems. A murder or assault on a member of the Aryan Brotherhood may only be carried out with Commission approval.

The operations of the Aryan Brotherhood resemble those of organized crime syndicates outside of prison. Aryan Brotherhood members control drug traf-

---

wise indicated, the facts are all obtained from the First Superseding Indictment, the filings made in this action, and the trial transcripts from the trials already completed against other defendants named in this indictment.

2. The Aryan Brotherhood has even aligned itself with El Rukins, a black gang from Chicago, in an effort to further its narcotics distribution.

3. The gang was able to arrange for its members to congregate in state prison in Chino, California by defending themselves against various criminal charges of murder and assault and subpoenaing their fellow gang members to appear as witnesses on their behalf. Whenever an inmate was subpoenaed, he would be transferred to Chino pending his appearance as a witness.

ficking, gambling, and prostitution inside of prisons. They use murder and the threat of murder to maintain their position of authority within the prison population at large. Aryan Brotherhood members have had other prisoners killed for transgressions as minor as making disparaging remarks about the Aryan Brotherhood. The Aryan Brotherhood has also used murder and the threat of murder to maintain order within its own ranks. Several of the murders charged in the indictment are murders of Aryan Brotherhood members who either did not follow orders from the Commissions or were suspected of providing information about the gang to the authorities. The Aryan Brotherhood has utilized the threat of violence against family members outside of prison as another means for keeping its members in line. In 1983, Stephen Barnes, a former member of the Aryan Brotherhood, testified at a murder trial against a member of the California Commission. Mr. Barnes was placed in protective custody, and thus secure from any direct retaliation. Since the Aryan Brotherhood could not get to Mr. Barnes, they decided instead to go after his family. Aryan Brotherhood member Curtis Price had been recently released on parole. On the orders of the California Commission, Mr. Price drove to the house of Stephen Barnes' father, Richard, and shot him three times in the head.

The Government indicted forty defendants in this case, the vast majority of whom are Aryan Brotherhood members.

The defendants were charged collectively under the Racketeer Influenced and Corrupt Organizations Act ("RICO"). The Government alleged a total of forty-six separate acts of racketeering (acts involving murder, extortion, robbery, and narcotics trafficking) in furtherance of the Aryan Brotherhood. Among these forty-six acts are thirteen murders, eleven attempted murders, and three additional conspiracies to murder. The indictment targeted much of the leadership of the Aryan Brotherhood.[4] Defendants Barry "The Baron" Mills and Tyler "The Hulk" Bingham are two of the members of the Federal Commission, the highest ranking body in the Aryan Brotherhood. Defendants John Stinson, Richard Terflinger, Robert Griffin, and David Chance have all been members of the California Commission. Several other defendants, including David Sahakian, Cleo Roy, Wayne Bridgewater, Glenn Filkins, and Ronald Slocum, are members of the Federal or California Councils. All told, the Government initially charged seventeen defendants with various special circumstances necessary for a jury to return a death sentence. Included in these seventeen were almost all of the members of the Commissions and Councils named in the indictment.

The Government first proceeded to trial against Mr. Mills and Mr. Bingham, the two highest defendants in the Aryan Brotherhood named in the indictment.[5] Mr. Mills is one of the founding members

---

**4.** According to Officer Mike Halualani of the Bureau of Alcohol, Tobacco and Firearms, the lead investigator in this case, the goal of the indictment was to " 'cut off the head, not the body.' " David Grann, *The Brand*, THE NEW YORKER, February 16 & 23, 2004, at 168.

**5.** Also prosecuted in the first trial were Edgar Hevle and Christopher Gibson. The Government initially sought the death penalty for Mr. Gibson, briefly the head of the Aryan Brotherhood's department of security, on account of

his involvement in two of the attempted murders charged in the indictment, the stabbings of Jeffrey Barnett and Michael Nevergall. Approximately five months before trial, the Government withdrew its notice of intention to seek the death penalty against Mr. Gibson. Although Mr. Hevle was charged with death-eligible crimes for being a conspirator in the murders of Frank Joyner, Abdul Salaam, and Arva Lee Ray, the Government never sought death against him.

of the Federal Commission, and one of the oldest members of the Aryan Brotherhood. In 1979, during his incarceration at a maximum security prison in Georgia, he followed a fellow inmate into a recreation shed and slit his throat with so much force that it nearly decapitated him. From his position at the head of the organization, Mr. Mills ordered no fewer than seventeen additional murders, all of which were attempted and eight of which were successful. Along with Mr. Bingham, he was responsible for ordering the race war against the DC Blacks, a conflict that resulted in at least two dead inmates and several more assaulted in various federal prisons. Mr. Bingham was responsible for ordering no fewer than eleven murders, all of which were attempted and five of which were successful. Mr. Mills' name appears more than any other individual's in the indictment, and Mr. Bingham's is similarly prevalent. After sixty-one days of trial, spanning over four months, the jury found Mr. Mills and Mr. Bingham guilty of five counts charged in the indictment, covering several of the murders ordered by the defendants. At the penalty phase, the jury deliberated for six days to determine whether Mr. Mills and Mr. Bingham should be sentenced to death. The jury was unable to reach a unanimous verdict. Mr. Mills and Mr. Bingham did not receive death sentences for their involvement in multiple murders committed and attempted at their orders by members of the Aryan Brotherhood. They were ultimately sentenced to life terms without the possibility of parole.

After the trial against Mr. Mills and Mr. Bingham concluded, the Government next proceeded to trial against John Stinson, Robert Griffin, and David Chance. All of these men were members of the California Commission, the highest body in the California faction of the Aryan Brotherhood.[6] It was Mr. Stinson and Mr. Griffin who made the decision to attack the family of any member who turned on the Aryan Brotherhood, and they gave the orders to Curtis Price to kill Richard Barnes in his home in Temple City. Mr. Stinson and Mr. Griffin were involved in ordering six murders, and Mr. Chance gave orders in two. These men ordered several murders for such transgressions as failing to follow orders given by the Aryan Brotherhood and disrespecting high-ranking members of the Aryan Brotherhood. Each man was charged with two counts of murder for ordering the murders of Arthur Ruffo and Aaron Marsh. Both victims were members of the Aryan Brotherhood who had disobeyed orders from the California Commission. Under the rules of the organization, as members, neither Mr. Ruffo nor Mr. Marsh could be murdered except by express order from the Commission. Initially, the Government sought the death penalty against Mr. Stinson, Mr. Griffin, and Mr. Chance for their role in ordering the murders of Mr. Marsh and Mr. Ruffo. However, soon after learning that the jury did not impose the death penalty against Mr. Bingham and Mr. Mills, the Government withdrew its intention to seek the death penalty against all three men.

In addition to Mr. Stinson, Mr. Griffin, and Mr. Chance, the Government has formally withdrawn the death penalty from four other defendants against whom death was originally sought: Ronald Slocum, Elliot Grizzle, Jason Schwyhart, and Christopher Gibson. Of these four men, only Ronald Slocum held a position of leadership in the Aryan Brotherhood. Mr. Slocum was one of the founding members of

---

**6.** Mr. Griffin was among the founding members of the California Commission when that body was created in 1982. Mr. Stinson was elevated to the Commission in 1989, and Mr. Chance was elevated in 1994.

the California Council, and has been the primary communicator between the Federal and California factions of the Aryan Brotherhood. Like Mr. Griffin and Mr. Stinson, Mr. Slocum was involved with the decision to murder Richard Barnes for his son's transgressions. He was also instrumental in sending messages between Mr. Mills, Mr. Bingham, and Aryan Brotherhood members in Lewisburg to initiate the race war against the DC Blacks. Mr. Slocum was charged with five counts of murder in the indictment, as many as Mr. Mills and Mr. Bingham.

Although the main targets of the indictment were the leaders of the Aryan Brotherhood, particularly the Federal and California Commission members, the Government also indicted several individuals who carried out the orders to kill. The Aryan Brotherhood employs two primary methods to kill its victims: strangling and stabbing. Among the stranglers are Glenn Filkins and Cleo Roy. Mr. Filkins tore a bed-sheet into strips and braided them together to make a garrote, then slipped the garrote over his victim's head and throttled him. Mr. Filkins was tried and convicted for this murder in the 1990s. When he was placed back in federal custody, Mr. Filkins was rewarded with full membership in the Aryan Brotherhood for carrying out this murder. Mr. Roy and a co-conspirator, John Campbell, were assigned to murder Thomas Lamb, who had failed to carry out an order to murder on behalf of the Aryan Brotherhood. Mr. Roy choked the life out of Mr. Lamb with his own hands while Mr. Campbell held down Mr. Lamb's legs. After Mr. Lamb was dead, the two men strung him up from the shelves in his cell to make it look like a suicide. Mr. Roy was subsequently promoted to the Federal Council. Gary Joe Littrell, the defendant currently before this Court, also strangled his victim. Mr. Littrell entered the cell of Aaron Marsh and choked him to death with his

bare hands. He carried out this attack on orders from Mr. Griffin, Mr. Stinson, Mr. Chance, and another member of the California Commission, Richard Terflinger.

Among the stabbers employed by the Aryan Brotherhood are Allen Benton, Clifford Smith, and Ronnie Joe Chriswell. When a member of the Aryan Brotherhood is told to stab someone, the goal is not merely to injure, but to kill. Members study anatomy textbooks to learn the most vulnerable locations on a person's body, so that they might attack their victims with precision. As the following murders demonstrate, the Aryan Brotherhood uses more than just anatomical precision to insure that the death of the victim is not left to chance. Allen Benton, a participant in the organized race war in Lewisburg and a member of the Federal Council, used a twelve-inch piece of steel to cut his victim through the throat, lungs, and heart, stabbing multiple times before leaving him to die. Clifford Smith carried out a public execution on behalf of the Aryan Brotherhood, during which he stabbed his victim thirty-seven times in full view of the prison guards and other inmates. Ronnie Joe Chriswell first subdued his victim by striking him over the head with a lead pipe. While the victim was unconscious, Mr. Chriswell and another Aryan Brotherhood member then stabbed him at least twenty-five times in the chest. The victim was so badly cut that the precise number of stab wounds could not be determined.

The indictment alleges thirteen murders and eleven attempted murders as RICO acts in furtherance of the Aryan Brotherhood. It identifies thirty-two individuals who carried out these attacks, seventeen of whom were formally charged as defendants. The stranglers and stabbers listed above were all identified as killers in the indictment, though only Mr. Filkins, Mr. Roy, and Mr. Littrell were charged as

defendants in this case. The Government reached plea agreements with Mr. Filkins and Mr. Roy, sentencing them to ten years for their crimes. Similarly, it reached a plea agreement with Allen Benton, who admitted to three other murders in addition to the one described above. Mr. Benton received a nine year sentence pursuant to his plea agreement. None of these men will face death for his crimes.

The only charge in the indictment that makes Mr. Littrell eligible for the death penalty is based on the killing of Aaron Marsh. Mr. Littrell was tried for this crime in California state court in 1998. The jury acquitted him of first-degree murder and found him guilty of second-degree murder. However, alleging juror misconduct, Mr. Littrell sought to have the verdict thrown out. Before the judge could rule on that motion, Mr. Littrell reached a plea agreement with the prosecution. He pled guilty to voluntary manslaughter and attempted second-degree murder. Mr. Littrell is currently serving his sentence pursuant to that agreement and will not be eligible for parole until 2034.

In this trial, the Government seeks to execute Mr. Littrell for his involvement in the death of Aaron Marsh. After the jury declined to impose the death penalty against Mr. Mills and Mr. Bingham, the Government indicated that it would reconsider its decision to seek death against Mr. Littrell. On January 12, 2007, the Government filed a notice of intent to continue to seek the death penalty. It is this decision that Mr. Littrell now challenges.

## II. ANALYSIS

"Death is today an unusually severe punishment, unusual in its pain, in its finality, and in its enormity. No other existing punishment is comparable to death in terms of physical and mental suffering." *Furman v. Georgia,* 408 U.S. 238, 287, 92 S.Ct. 2726, 33 L.Ed.2d 346 (1972) (Brennan, J., concurring). A sentence of death is truly ultimate, "a punishment different from all other sanctions in kind rather than degree." *Woodson v. North Carolina,* 428 U.S. 280, 303–04, 96 S.Ct. 2978, 49 L.Ed.2d 944 (1976). "The calculated killing of a human being by the State involves, by its very nature, a denial of the executed person's humanity." *Furman,* 408 U.S. at 290, 92 S.Ct. 2726 (Brennan, J., concurring). Once administered, a death sentence can never be undone.

In recognition of the uniquely solemn and severe duty involved in carrying out a sentence of execution, the Supreme Court "has been particularly sensitive to insure that every safeguard is observed." *Gregg v. Georgia,* 428 U.S. 153, 187, 96 S.Ct. 2909, 49 L.Ed.2d 859 (1976). In *Furman,* the Court invalidated the capital sentencing schemes of thirty-nine states and the federal Government because they afforded untrammeled discretion to judges and juries in determining whether or not to impose a death sentence. *Furman,* 408 U.S. at 239–40, 92 S.Ct. 2726 (*per curiam*). The primary concern arising out of such boundless discretion is that the imposition of death sentences was arbitrary and capricious.[7] Justice Stewart noted that recipients of a death sentence were "among a capriciously selected random handful" of eligible defendants, and that the Constitu-

7. The *Furman* Court also recognized that the death penalty was being imposed in a manner that strongly suggested the influence of racial discrimination. *See Furman,* 408 U.S. at 310, 92 S.Ct. 2726 ("[I]f any basis can be discerned for the selection of these few to be sentenced to die, it is the constitutionally impermissible basis of race.") (Stewart, J., concurring).

tion could not tolerate "legal systems that permit this unique penalty to be so wantonly and so freakishly imposed." *Id.* at 309–10, 92 S.Ct. 2726 (Stewart, J., concurring). Similarly, Justice White found defect with sentencing schemes that provided "no meaningful basis for distinguishing the few cases in which [the death penalty] is imposed from the many cases in which it is not." *Id.* at 313, 92 S.Ct. 2726 (White, J., concurring). The *Furman* Court held that the imposition of such arbitrary and capricious death sentences constituted cruel and unusual punishment, and was thus prohibited by the Eighth Amendment. *Id.* at 239–40, 92 S.Ct. 2726. Depriving an individual of the right to life based on an arbitrary and capricious decision reached by a sentencing body with unguided discretion also raised due process concerns. *Id.* at 359, 92 S.Ct. 2726, fn. 141 (Marshall, J., concurring).

In the wake of *Furman,* states passed new capital sentencing schemes that attempted to limit the discretion afforded to judges and juries. The most significant feature of these new schemes was the presence of aggravating factors, or special circumstances. In order for a defendant to receive a death sentence, the jury must find the presence of at least one of the statutorily enumerated aggravating factors beyond a reasonable doubt. *See Gregg,* 428 U.S. at 164–67, 96 S.Ct. 2909 (discussing Georgia statute). The Federal Death Penalty Act, under which Mr. Littrell has been charged, contains sixteen available aggravating factors a jury might find to support the imposition of the death penalty. *See* 18 U.S.C. § 3592(c). The post-*Furman* death penalty statutes also provide mechanisms for prompt and thorough review of the trial court proceedings to ensure that any sentence of death is not imposed arbitrarily. *See Gregg,* 428 U.S. at 166–67, 96 S.Ct. 2909 (discussing Georgia statute); 18 U.S.C. § 3595. The Supreme Court has concluded that these new

sentencing schemes provided sufficient limits on the discretion of sentencing bodies to withstand constitutional scrutiny. *Gregg,* 428 U.S. at 195, 96 S.Ct. 2909 ("[T]he concerns expressed in *Furman* that the penalty of death not be imposed in an arbitrary or capricious manner can be met by a carefully drafted statute that ensures that the sentencing authority is given adequate information and guidance."); *Jones v. United States,* 527 U.S. 373, 119 S.Ct. 2090, 144 L.Ed.2d 370 (1999) (recognizing the constitutionality of the Federal Death Penalty Act).

■ *"Furman* mandates that where discretion is afforded a sentencing body on a matter so grave as the determination of whether a human life should be taken or spared, that discretion must be suitably directed and limited so as to minimize the risk of wholly arbitrary and capricious action." *Gregg,* 428 U.S. at 189, 96 S.Ct. 2909. *Furman* and its progeny are concerned solely with the imposition of the death penalty by the judge or jury. The cases make no comment on the breadth of the discretion afforded to the Government to seek the death penalty against a particular defendant. However, it would be fundamentally inconsistent with the constitutional prohibition on the arbitrary *imposition* of the death penalty to say that an arbitrary decision *to seek* the death penalty is constitutionally permissible. The Fifth Amendment requires that every aspect of the process by which the Government seeks to put a defendant to death is consistent with due process of law. At a bare minimum, the protections of the Fifth Amendment must guarantee that the Government's decision to seek the death penalty is rational. When the Government's decision to seek death is wholly divorced from reason and arbitrarily disregards the totality of the relevant evidence, a capital prosecution based on that

decision would be repugnant to the Constitution.

To guarantee that the prosecution of Mr. Littrell is consistent with the due process protections provided by the Fifth Amendment, the Court must insure that the decision to continue to seek his execution is not arbitrary and capricious. The Government argues that the Court's role is limited to determining whether the indictment alleges an adequate factual basis to support a jury verdict that the defendant committed a capital crime and that one of the requisite aggravating factors is present. Citing the broad deference typically afforded to the prosecutor's discretion, the Government argues that it would be inappropriate for the Court to inquire any further into the decision-making process. Essentially, the Government argues that it can never act arbitrarily in seeking the death penalty against a defendant who has committed a death-eligible offense. However, this argument takes too narrow a view of the solemn duty borne by the Government in deciding whether to seek to deprive a citizen of his life. "[I]n capital cases the fundamental respect for humanity underlying the Eighth Amendment requires consideration of the character and record of the individual offender and the circumstances of the particular offense as a *constitutionally indispensable* part of the process of inflicting the penalty of death." *Woodson,* 428 U.S. at 304, 96 S.Ct. 2978 (emphasis added) (internal citation omitted). The obligation to consider all available information before starting the process of a Government-sponsored execution is equally incumbent on the prosecutor as on the jury. The decision to seek death, like the decision to impose it, must be based on the totality of the facts and circumstances at the time the decision is made.

The Attorney General and the United States Attorneys do retain "broad discretion" to enforce the nation's criminal laws. *Wayte v. United States,* 470 U.S. 598, 607, 105 S.Ct. 1524, 84 L.Ed.2d 547 (1985). "They have this latitude because they are designated by statute as the President's delegates to help him discharge his constitutional responsibility to 'take Care that the Laws be faithfully executed.'" *United States v. Armstrong,* 517 U.S. 456, 464, 116 S.Ct. 1480, 134 L.Ed.2d 687 (1996) (quoting U.S. Const., Art. II, § 3) (citing 28 U.S.C. §§ 516, 547). "Of course, a prosecutor's discretion is 'subject to constitutional constraints.'" *Id.* at 465, 116 S.Ct. 1480 (quoting *United States v. Batchelder,* 442 U.S. 114, 125, 99 S.Ct. 2198, 60 L.Ed.2d 755 (1979)). Even where a factual basis exists to charge a defendant with a particular crime, there are nonetheless circumstances where the decision by the prosecutor to charge the defendant with that crime violates the defendant's due process rights. A prosecutor may not use "an unjustifiable standard such as race, religion, or other arbitrary classification" to determine which crime to charge or which sentence to seek. *Oyler v. Boles,* 368 U.S. 448, 456, 82 S.Ct. 501, 7 L.Ed.2d 446 (1962). Similarly, the prosecutor may not seek an increased punishment against a defendant after that defendant has exercised a constitutional right, as the Due Process Clause is "offended" by prosecutions that "pose a realistic likelihood of 'vindictiveness.'" *Blackledge v. Perry,* 417 U.S. 21, 27, 94 S.Ct. 2098, 40 L.Ed.2d 628 (1974). Thus, the discretion of a prosecutor to charge a defendant with a particular offense or seek a certain sentence against a defendant is clearly limited by constitutional constraints.

The Government also may not simply turn a blind eye to relevant mitigating or aggravating evidence when it decides whether to seek the death penalty. At trial, the finder of fact is obligated to consider any mitigating evidence present-

ed on behalf of the defendant. 18 U.S.C. § 3592(a). The sentencing body shall consider any "factors in the defendant's background, record, or character or any other circumstance of the offense that mitigate against imposition of the death sentence." 18 U.S.C. § 3592(a)(8).[8] Thus, in order to make an educated, rational decision regarding whether or not to seek the death penalty against a defendant, the Government must take into account all available relevant information.[9] That the defendant has committed a death-eligible crime and that aggravating factors are present are certainly relevant factors in the Government's decision. However, a decision made on those grounds alone, without any consideration of the relevant mitigating factors, would be arbitrary and capricious, and an unconstitutional exercise of the prosecutor's charging authority. Instead, the Government must take into account the totality of the circumstances, weighing and considering both the aggravating and mitigating evidence, before deciding to seek the death penalty.

When the totality of the circumstances in this case is considered, including the facts of Mr. Littrell's offense and the aggravating and mitigating factors present, it is clear that no rational decision-maker would continue to seek death against Mr. Littrell. For purposes of this motion, the Court considers the evidence in the light most favorable to the Government. The Court presumes that the Government will be able to prove all elements of the offense and all aggravating factors alleged in the indictment and in the notice of intent to seek death against Mr. Littrell.[10] The Court also only considers those mitigating factors that are undisputed and incontestable by the Government. Even in the light most favorable to the Government, the decision to continue to seek to execute Mr. Littrell under the totality of the circumstances at the time that decision was made is wholly divorced from reason, and fundamentally inconsistent with the Fifth Amendment protection of due process. The Government's decision is arbitrary and capricious, and accordingly, the death penalty must be stricken from this case.

The starting point for this analysis is the facts and circumstances of Mr. Littrell's crime and the aggravating factors alleged by the Government. The Government has accused Mr. Littrell of entering the cell of Aaron Marsh and strangling his victim with his bare hands. Mr. Littrell did this on orders from his superiors in the Aryan Brotherhood. He intended to kill his vic-

---

8. Among the specifically enumerated factors potentially relevant to this case are that the defendant was under unusual or substantial duress, § 3592(a)(2), and that equally or more culpable defendants will not be punished by death, § 3592(a)(4). A jury could also potentially find that although Mr. Littrell was a major participant in the murder of Aaron Marsh, his participation in the entire Aryan Brotherhood enterprise alleged in the indictment was relatively minor. *See* § 3592(a)(3).

9. The Government's own internal policy reflects this concern. "In determining whether or not the Government should seek the death penalty, the United States Attorney, the Attorney General's Committee, and the Attorney General must determine whether the statutory aggravating factors applicable to the offense and any non-statutory aggravating factors sufficiently outweigh the mitigating factors applicable to the offense to justify a sentence of death." United States Attorneys' Manual § 9–10.080. In making this determination, the prosecutor is directed that "any mitigating factor reasonably raised by the evidence should be deemed established." *Id.*

10. In its moving papers and at oral argument, the Government disclosed no additional reasons for seeking to execute Mr. Littrell beyond those apparent from the face of the indictment and the notice of intent to seek the death penalty. Accordingly, the Court assumes that there were no other aggravating factors present which impacted the Government's decision.

tim, and acted with substantial planning and premeditation. Mr. Littrell committed this murder after having previously been convicted of a violent felony involving the use of a firearm; namely, an armed robbery. Moreover, Mr. Littrell showed a continuing pattern of violence, a history of institutional misconduct, and low rehabilitative potential, all aggravating factors that would support a finding of death.

These facts portray a brutal crime committed by a dangerous criminal with a history of violence. Were there no mitigating factors present, the decision to seek death would be supported by the facts of Mr. Littrell's crime.[11] "The criminal acts with which we are confronted are ugly, vicious, reprehensible acts. Their sheer brutality cannot and should not be minimized." *Furman*, 408 U.S. at 315, 92 S.Ct. 2726 (Marshall, J., concurring). This Court is not here to condone Mr. Littrell's conduct. Instead, the job of the Court is to insure that when the Government seeks to execute Mr. Littrell for this conduct, the decision to do so is rational, and not arbitrary, capricious, or in utter disregard of the relevant facts and circumstances.

To make a rational decision, the Government must consider the context in which Mr. Littrell committed his crime. In the indictment, the Government alleges that the Aryan Brotherhood is a powerful and violent criminal enterprise. According to the Government, Mr. Littrell is a low-level member of the Aryan Brotherhood who was ordered to kill Mr. Marsh by the leaders of the California Commission. The Government alleges that Mr. Littrell's crime was one of forty-six separate criminal acts committed by at least forty people in furtherance of the Aryan Brotherhood. Among these crimes are several violent murders and attempted murders ordered by the leaders of the Aryan Brotherhood and committed by its members, like Mr. Littrell.

The Government also must consider the compelling mitigating factors that were undisputed at the time it made the decision to continue to seek death against Mr. Littrell. The first mitigating factor is the Government's failure to obtain the death penalty against Mr. Bingham and Mr. Mills. The indictment alleges that Mr. Bingham and Mr. Mills occupied positions of highest authority within the Aryan Brotherhood. They were charged with and convicted of ordering multiple murders in multiple prisons, of inciting race wars, and of committing these criminal acts in furtherance of the Aryan Brotherhood. From the face of the indictment, it is clear that the Government considered Mr. Mills and Mr. Bingham to be the two most culpable individuals in the entire organization. The Government presented its case against Mr. Mills and Mr. Bingham in intimate detail. Dozens of witnesses testified over a period of months about the horrific acts perpetrated under the orders of these men. The jurors heard graphically detailed testimony about all of the stabbings and stranglings with which Mr. Mills and Mr. Bingham were charged. They watched videos depicting those attacks that were captured by the prisons' security cameras. By the end of the trial, the jury had been exposed to the full scope of the brutality, violence, fear, and intimidation imposed by the Aryan Brotherhood at the

---

11. Given that most of the relevant mitigating factors developed only recently, after the filing of the indictment, the Government's initial decision to seek death may have been constitutionally proper. However, when the Government seeks to take a man's life, it cannot rely on an outdated factual scenario, but must reevaluate its decision as the relevant circumstances change. The facts and circumstances surrounding the Government's decision to continue to seek death against Mr. Littrell were significantly different than those present during the initial decision-making process.

direction of Mr. Mills and Mr. Bingham. And yet, the jury was unable to unanimously find that the conduct of Mr. Mills and Mr. Bingham was sufficiently reprehensible to warrant the ultimate punishment.

"[A] jury that must choose between life imprisonment and capital punishment can do little more—and must do nothing less—than express the conscience of the community on the ultimate question of life or death." *Witherspoon v. Illinois*, 391 U.S. 510, 519, 88 S.Ct. 1770, 20 L.Ed.2d 776 (1968). The Government has a strong interest in affording a jury of twelve citizens the opportunity to express the conscience of the community. *Jones*, 527 U.S. at 382, 119 S.Ct. 2090. Accordingly, when a jury cannot agree that certain crimes or defendants merit the ultimate sentence, the Government must give that result significant weight and deference. By not imposing the death penalty on Mr. Bingham and Mr. Mills, the jury expressed the conscience of the community that the crimes committed by the Aryan Brotherhood did not merit a sentence of death. The jury found Mr. Bingham and Mr. Mills responsible for the vast majority of the violent acts perpetrated by the gang. It heard extensive evidence regarding the graphic details of the crimes committed by these men and by their subordinates on their behalf. The inability of the jury to conclude that the most culpable men in the organization were not worthy of the death penalty must be considered by the Government before it seeks to execute lower-level members of the same organization charged in the same indictment.

It is clear that the Government did take the result in the trial of Mr. Mills and Mr. Bingham into account in revisiting its intent to seek the death penalty against certain defendants. It was only a matter of weeks after the trial against Mr. Mills and Mr. Bingham that the Gov-

ernment decided not to seek the death penalty against Mr. Stinson, Mr. Griffin, and Mr. Chance. The fact that these three men will not face the death penalty is the second mitigating factor relevant to the decision to continue to seek death against Mr. Littrell. Indeed, this mitigating factor is arguably the most significant one. All three were members of the California Commission, the highest position of authority in the California faction of the Aryan Brotherhood. Mr. Stinson, Mr. Griffin, and Mr. Chance all ordered Mr. Littrell to kill Aaron Marsh. According to the rules of the Aryan Brotherhood, the only way a member of the gang could be killed is by direct order from the Commission. Thus, the murder of Aaron Marsh would never have occurred had the Commission not ordered Mr. Littrell to commit the crime. Mr. Stinson, Mr. Griffin, and Mr. Chance all ordered several other murders in addition to the killing of Aaron Marsh. They directed a member of the Aryan Brotherhood to murder Richard Barnes in his own home, for no reason other than that he was related to an Aryan Brotherhood member who testified against the gang. According to the indictment, these individuals are the most powerful members of the Aryan Brotherhood in the California prison system, and the must culpable defendants for the actions committed by the California faction. By the Government's own choice, these defendants will not face death for their crimes. The Court is at a complete loss to understand how the Government can in good faith seek death against a low-level member of the Aryan Brotherhood like Mr. Littrell when it does not seek that ultimate punishment against the more culpable Commission leaders like Mr. Stinson, Mr. Griffin, and Mr. Chance.

The third factor that the Government must consider is the manner in which defendants named in the indictment who

have similar culpability to Mr. Littrell are being punished. Glenn Filkins and Cleo Roy are just two of the Aryan Brotherhood members who have committed similar crimes to Mr. Littrell—they entered the cells of fellow prisoners and strangled their victims with their bare hands. All three were following the orders of the Federal or California Commissions when they committed their crimes. The victims of Mr. Filkins, Mr. Roy, and Mr. Littrell are all similar. All three were Aryan Brotherhood members who took action against the Aryan Brotherhood, either by providing information to the authorities or by failing to follow orders to kill. Additionally, Mr. Filkins has displayed no remorse whatsoever for his crime. Instead, it was the means that allowed him to gain full membership in the Aryan Brotherhood. Upon return to federal custody after being convicted of the murder, Mr. Filkins celebrated his promotion by getting drunk on prison-brewed alcohol with his fellow members. Neither Mr. Filkins nor Mr. Roy will be put to death for their crimes.

The Government argues that while other individuals may be more culpable in the overall criminal conduct of the Aryan Brotherhood, Mr. Littrell is the most culpable defendant in the murder of Aaron Marsh. Accordingly, the Government claims that it should be entitled to focus only on the murder of Mr. Marsh in deciding to seek death against Mr. Littrell. This argument, however, ignores the very indictment brought by the Government in this case, as well as the charges made against all defendants, including Mr. Littrell. Mr. Littrell is not on trial only for

the murder of Mr. Marsh, nor is the Government seeking to prosecute the murder of Mr. Marsh in isolation. Instead, it is alleged that this murder was one of forty-six discrete criminal acts committed by forty defendants in furtherance of a violent and dangerous criminal enterprise. Mr. Littrell is not charged merely with murdering Mr. Marsh, but with doing so in furtherance of the Aryan Brotherhood. At trial, the Government will seek to prove both Mr. Littrell's involvement in the organization, and that the murder was committed on orders from superiors in the organization and in support of the organization. It would be flatly inconsistent with the charges brought in the indictment to find that the Government need not consider the relative culpability of Mr. Littrell in comparison to that of other members of the organization charged in the indictment and in comparison to the conduct committed by the organization as a whole.

The fourth mitigating factor the Government must consider is that Mr. Littrell has previously pled guilty to a voluntary manslaughter charge for the very crime now used to justify his execution.[12] Under the California penal code, voluntary manslaughter is the unlawful killing of a human being without malice upon a sudden quarrel or heat of passion. CAL.PENAL CODE § 192. A defendant may not be put to death for committing manslaughter under either state or federal law. A state court considered the facts surrounding Mr. Littrell's offense and concluded that Mr. Littrell acted without malice, and upon a sudden impulse, when he killed Mr. Marsh. Thus the only crime for which Mr. Littrell could be executed is a killing that was

---

**12.** The federal government is not formally estopped, or prohibited by the Double Jeopardy Clause, from trying Mr. Littrell for the murder of Aaron Marsh. *See United States v. Wheeler,* 435 U.S. 313, 316–17, 98 S.Ct. 1079, 55 L.Ed.2d 303 (1978) (describing the "well-established principle" that a state prosecution

does not bar a subsequent federal prosecution). Even if the murder itself could not be retried, a RICO charge is a separate offense from the underlying predicate act, and may be separately prosecuted. *See United States v. Luong,* 393 F.3d 913, 917 (9th Cir.2004).

previously resolved as manslaughter. The Court recognizes that the Government is not legally bound by the prior state resolution of Mr. Littrell's culpability and mental state regarding the death of Aaron Marsh. However, principles of federalism dictate that the Government gives serious weight to the prior resolution of a sovereign state before it imposes the enormous burden and cost of a capital prosecution on the judicial system and on its citizens.[13]

The cumulative weight of the mitigating evidence is overwhelming. Mr. Littrell was charged in a single indictment with thirty-nine co-defendants. All are alleged to be part of a dangerously corrupt and violent organization, the Aryan Brotherhood. The primary targets of the indictment were the leaders and organizers of the Aryan Brotherhood. These were the men who handed out the orders to kill, and these were the men alleged to be the most culpable and most responsible for the entire reign of brutal violence created by the Aryan Brotherhood. And yet these men will not be facing execution for their crimes. The jury, expressing the conscience of the community, did not hand down a death sentence against Mr. Bingham and Mr. Mills, the two most culpable Aryan Brotherhood members in the indictment. Responding to the message sent by this jury, the Government decided not to seek the death penalty against Mr. Stinson, Mr. Griffin, and Mr. Chance. These men ordered Mr. Littrell to kill Aaron Marsh. They also ordered several other Aryan Brotherhood members to carry out various other murders and assaults. None of these three will face a sentence of death. Moreover, several organizational soldiers like Mr. Littrell who carried out orders to

kill by brutally strangling or stabbing their victims have pled to sentences ranging from six to fourteen years for their crimes, and will not face execution. Finally, the conduct for which Mr. Littrell is to be executed has been previously adjudicated in state court as manslaughter. In light of these facts, no rational decision-maker could conclude that Gary Joe Littrell's conduct was so reprehensible, and his moral culpability so great, that he should face execution when the leaders of the organization, the men who ordered Mr. Littrell to kill, and several men who have committed identical crimes to Mr. Littrell in furtherance of the Aryan Brotherhood will not face similar punishment.

### III. CONCLUSION

The decision whether or not to seek death against a defendant is a prosecutor's most solemn task. It must be made only after careful consideration of all relevant facts and circumstances, including both aggravating and mitigating factors. It is vital to the constitutional protections of due process and to the moral authority of the Government to end the life of one of its citizens that the decision to seek death is neither arbitrary and capricious nor wholly divorced from reason. In this case, when all relevant facts and circumstances are considered, it is clear that no rational decision-maker would continue to seek to execute Gary Joe Littrell. Accordingly, the Government's continued intention to seek the death penalty is arbitrary and capricious, and must be stricken.

---

13. Internal Government policy precludes federal prosecution following a prior state prosecution based on substantially the same act unless certain criteria are met. *See* United States Attorneys' Manual § 9–2.031(A). Similarly, when the Government seeks to bring a RICO prosecution, it typically may only allege predicate offenses that have previously been prosecuted if there are a sufficient number of other predicate offenses to sustain the RICO charge if the previously prosecuted offenses are excluded. *Id.* § 9–2.031(B).